## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MADYUN ABDULHASEEB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-05-1211-W |
| | ) | |
| SAM CALBONE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner appearing pro se, brings this action pursuant to 42 U.S.C. § 1983 and RLUIPA, 42 U.S.C. 2000cc, alleging various violations of his constitutional rights. Pursuant to an order by United States District Judge Lee R. West, the matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). Before the Court is the motion to dismiss/motion for summary judgment[1] of Defendants Ron Anderson, G. Franzese, Melinda Guilfoyle, Kameron Harvenek, Richard Kirby, Debbie Morton, Mike Mullin, and Ron Ward ("DOC Defendants"); the motion for summary judgment of Defendants Lt. Barger, Lt. Beasley, "Branum," Sam Calbone, Major DeVaughn, Mr. Dishman, "Elizondo," J. Haskins, Z. Jacques, Travis Smith, "Vanwey," and Ken Wood ("Cornell Defendants"); and the motion for summary judgment of Defendants Mock and Cartwright ("Canteen Defendants"). For the following reasons, it is recommended that the motions for summary judgment be granted.

---

[1]Because the Plaintiff and Defendants have presented affidavits and evidentiary documents beyond the pleadings, the undersigned has considered Defendants' alternative motion as one for summary judgment. Fed. R. Civ. P. 12(b); Wells v. Shalala, 228 F.3d 1137, 1140 n.1 (10th Cir. 2000).

In his Second Amended Complaint, Plaintiff names twenty-three individual Defendants, whom he identifies as either affiliated with the Great Plains Correctional Facility[2] (GPCF) in Hinton, Oklahoma, the Oklahoma State Penitentiary (OSP) in McAlester, Oklahoma, or the Oklahoma Department of Corrections administrative office (ODOC).  The named Defendants are:  Sam Calbone, Warden, Great Plains Correctional Facility; Ken Wood, Chaplain, Great Plains Correctional Facility; Lt. Barger, Disciplinary Officer, Great Plains Correctional Facility; Travis Smith, Deputy Warden, Great Plains Correctional Facility; J. Haskins, Grievance Coordinator, Great Plains Correctional Facility; Vanwey, Case Manager, Great Plains Correctional Facility; Elizondo, Unit Manager, Great Plains Correctional Facility; Branum, Investigator, Great Plains Correctional Facility; Ron Ward, Director, Oklahoma Department of Corrections; Melinda Guilfoyle, Manager of Administrative Review and Designee of Director, Oklahoma Department of Corrections; Debbie L. Morton, Manager of Administrative Review and Designee of Director, Oklahoma Department of Corrections; Richard Kirby, General Counsel, Oklahoma Department of Corrections; Ron Anderson, Deputy General Counsel, Oklahoma Department of Corrections; Mike Mullin, Warden, Oklahoma State Penitentiary; G. Franzese, Chaplain, Oklahoma State Penitentiary; Kameron Harvanek, Deputy Warden, Oklahoma State Penitentiary; Kenny Demby, Food Service Supervisor, Great Plains Correctional Facility; Mr. Mock, Food Service Supervisor, Great Plains Correctional Facility; Ms. Cartwright, Food Service Supervisor, Great Plains Correctional Facility; Major Devaughn, Chief of Security, Great Plains Correctional Facility; Lt.

---

[2]Defendants Mock and Cartwright (Canteen Defendants) are actually employees of a company contracted to provide food service at GPCF.

2

Beasley, Lieutenant, Great Plains Correctional Facility; Z. Jacques, Deputy Warden, Great Plains Correctional Facility; and Dishman, Grievance Coordinator, Great Plains Correctional Facility.

In his seventeen-count complaint, Plaintiff predominantly alleges that Defendants have burdened his religious exercise. In Count I, Plaintiff alleges that Defendants substantially burdened his freedom of religion by not providing him with a full-time orthodox Muslim spiritual leader like they do similarly situated Christian inmates. Second Amended Complaint, [p. 10].[3] In Count II, Plaintiff claims that he was forced to accept pudding on his food tray under the threat of "being locked up for disobedience to a direct order," substantially burdening his sincerely-held religious beliefs. Id. Plaintiff claims in Count III that he was denied equal protection of the law by not being allowed a second friend on his visitation list as do similarly situated inmates in medium security facilities. Id. at [12]. In Count IV, Plaintiff claims that Defendants substantially burdened his sincerely-held religious beliefs by not providing him with an Islamic Revival "on the GPCF yard like they do Christian Revivals annually for the Christian inmates." Id. at [13]. In Count V, Plaintiff claims that Defendants substantially burdened the expression of his religion by not providing him with Halal meats or poultry during the Feast of the Sacrifice. Id. As his sixth count, Plaintiff contends that Defendants have established Christianity as the state religion, substantially burdening the expression of his religion. Id. In Count VII, Plaintiff contends that Defendants have substantially

---

[3]The use of a bracketed page number refers to the Electronic Court Filing system's page number for the document in question. The undersigned finds that a combination of attached pages and missing page numbers in the Second Amended Complaint makes normal page citations to that document particularly confusing.

burdened the expression of his religion by establishing Christianity as the state religion by annually publishing and disseminating a holiday pamphlet advertising Christian religious services.  Id. at [11].  As Count VIII, Plaintiff claims that Defendants retaliated against him for exercising his right to petition the government for redress of grievances. Id. at [14].   In Count IX, Plaintiff contends that Defendants substantially denied him freedom of religious expression by refusing to allow him to celebrate the feast of fast breaking with Halal meats from Muslim vendors as promised.  Id.  In Count X, Plaintiff alleges that he was denied a Halal diet during his stay at OSP, substantially burdening his religious exercise.  Second Amended Complaint, p. [18].  In Count XI, Plaintiff claims that the Defendants violate the First and Fourteenth Amendments as well as 42 U.S.C. § 2000cc by spending all state money on secular needs and not spending any money on inmate religious needs.  Second Amended Complaint, p. [18].  In Count XII, Plaintiff contends that "Defendants substantially burdened [his] sincerely held religious belief in the most restrictive manner under the color of state law by not providing ... a paid civil service DOC Muslim Spiritual Leader."  Id.   In Count XIII, Plaintiff claims that Defendants confiscated his hardback religious books, including the Qur'an, without providing an alternative softcover alternative at state expense.  Id. at [19].  Next, Plaintiff contends that Defendants burdened the exercise of his religion by not providing him with an opportunity to attend congregational prayer or other Islamic religious services while at the Oklahoma State Penitentiary.  Id.   In Count XV, Plaintiff claims that pursuant to an unwritten rule he was kept at classification level one after a misconduct was overturned in order to lengthen his sentence and deny him "gang pay to satisfy ...

stockholders." <u>Id.</u>   In Count XVI, Plaintiff contends that he was denied promotion and earned credit in violation of his right to equal protection following dismissal of his misconduct.   <u>Id.</u> at [19].   Finally, in Count XVII, Plaintiff alleges that he was denied "special pay" for work done on special projects as was paid to similarly situated inmates. <u>Id.</u> at [20].

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only where the pleadings and any supporting documentary materials "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   In considering a motion for summary judgment, the court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party. <u>Calhoun v. Gaines</u>, 982 F.2d 1470, 1472 (10th Cir. 1992); <u>Manders v. Oklahoma</u>, 875 F.2d 263, 264 (10th Cir. 1989).   A dispute is "genuine," when viewed in this light, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248 (1986).   "Material facts" are "facts that might affect the outcome of the suit under the governing law."  <u>Id.</u>

To obtain summary judgment, the moving party need not affirmatively negate the nonmovant's claims.   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Rather, the moving party initially bears the burden only of " 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  <u>Id.</u>, at 325.   Once the moving party has satisfied this burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  <u>Id.</u> at 324. The

5

nonmoving party "may not rest upon mere allegation" in his pleading to satisfy this requirement  <u>Anderson</u>, 477 U.S. at 256.   Rather,  Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324.

## II.  UNDISPUTED FACTS

Based upon the Second Amended Complaint, the initial and supplemental special reports, and the evidentiary material appended to the various motions, responses, and replies filed herein, the undersigned finds the following material facts to be uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to Plaintiff.  Immaterial facts and facts not properly supported by the record have been omitted.

Plaintiff is a State prisoner currently incarcerated at the James Crabtree Correctional Center; however, the allegations herein arose during his incarceration at Great Plains Correctional Facility, a private prison located in Hinton, Oklahoma, and the Oklahoma State Penitentiary in McAlester, Oklahoma. Special Report, Part I (SR I ) Exhibit 1 and Special Report, Part II (SR II), 2 Attachment (Att.)1 SR I, Att. 1.

The grievance policy in effect during the relevant time period required DOC prisoners housed in private prisons to comply with ODOC's grievance policy in order to exhaust their administrative remedies. See Exhibit 1, paragraph I.C. DOC Defendants'

[First] Motion to Dismiss.[4] Thus, in order to exhaust their administrative remedies, prisoners must follow a three-step written process.

To exhaust his administrative remedies pursuant to ODOC's grievance procedure for all claims not involving misconducts, a prisoner within ODOC's custody is required to properly and timely file for each claim: (1) a request to staff; (Exhibit 1 at 4, section IV.B); (2) a grievance to the facility head (Exhibit 1 at 5, section V); and (3) an appeal of the facility head's response to the administrative review authority (Exhibit 1 at 8, section VII.B). An inmate has not exhausted his available administrative remedies until he properly and timely files a grievance appeal to the administrative review authority and receives a response from that office. Exhibit 1 at 9, section VII.D.

As evidenced by the Special Report and by the exhibits to Plaintiff's Second Amended Complaint, GPCF's grievance policy is consistent with ODOC's grievance policy. GPCF provides its prisoners with the opportunity to file a request to staff, see, e.g., SR I, Att. 2 at 1, and a grievance to the facility head. See, e.g., SR I, Att. 2 at 3. The grievance form GPCF utilizes contains instructions for DOC state inmates to appeal GPCF's grievance response to the ODOC Director. See, e.g., SR I, Att. 2 at 3. Thus, an inmate within the State of Oklahoma's custody who is incarcerated at GPCF must file a request to staff and a grievance at GPCF, then file a grievance appeal to ODOC's administrative review authority to exhaust his administrative remedies.

Prisoners who abuse the grievance process by continuing to file grievances which

---

[4]To avoid confusion, DOC Defendants' earlier motion on the issue of exhaustion will be referred to as "DOC Defendants' [First] Motion to Dismiss," and Plaintiff's response will be referred to as "Plaintiff's Response to [First] Motion to Dismiss." Two motions to dismiss were actually filed on behalf of two separate groups of DOC Defendants on the issue of exhaustion, but both are identical [Doc. Nos. 77 & 81].

do not comply with the policy, which are duplicative, or which are intended to harass may be placed on grievance restriction. Ex. 1 at 10-11, section IX.A, DOC Defendants' [First] Motion to Dismiss. Once a prisoner is placed on grievance restriction, he may file grievances only if he complies with the rules for prisoners on grievance restriction, including showing cause why he should be permitted to grieve and submitting an affidavit listing all grievances which he has filed in the last 12 months. Id. at Exhibit 1 at 11, section IX.B.2.

On November 8, 2004, Plaintiff submitted a grievance which he designated as an "emergency" directly to the ODOC Director. SR I, Att. 6 at 2. The grievance concerned Halal meats for a post-Ramadan feast. Id. Director's Designee Morton returned the grievance unanswered because the grievance failed to comply with policy. SR I, Att. 6 at 1. In addition, because of Plaintiff's continued failure to comply with the grievance procedures, he was placed on grievance restriction until December 1, 2005. Id. Plaintiff took no other action to exhaust his administrative remedies regarding this claim, which is contained in Count IX of Plaintiff's Second Amended Complaint.

On December 20, 2004, Plaintiff submitted a request to staff to GPCF Chaplain Kent Wood complaining that Defendant Wood posted flyers listing Christian services without posting flyers listing Islamic services. SR I, Att. 9 at 15 and Second Amended Complaint, Exhibit # 6, 3 of 7. Plaintiff submitted a grievance regarding that issue to GPCF's warden on December 30, 2004. SR I, Att. 9 at 12 and Second Amended Complaint, [14] Exhibit # 6, 2 of 7. Plaintiff appealed to DOC's administrative review

8

authority prior to January 27, 2005, and Director's Designee Debbie Morton assigned this initial appeal the number 05-27 and returned Plaintiff's grievance to GPCF for further review and investigation on January 27, 2005. SR I, Att. 9 at 8-9 and Second Amended Complaint, Exhibit #6, 1 of 7. Ms. Morton instructed Plaintiff that he could appeal the warden's amended response if he had grounds for appeal once he received the amended response. SR I, Att. 9 at 8 and Second Amended Complaint, Exhibit #6, 1 of 7. On February 9, 2005, GPCF's grievance coordinator sent a memorandum to Plaintiff explaining that Plaintiff's grievance had been returned unanswered based on Plaintiff's failure to submit an affidavit with a complete list of the grievances he had filed in the last twelve months in compliance with the rules for inmates on grievance restriction. SR I, Att. 9 at 10 and Second Amended Complaint, Exhibit # 6, 6 of 7. Plaintiff appealed again to DOC's administrative review authority, and Ms. Morton assigned the second appeal regarding this issue the number 05-431 and returned it to Plaintiff unanswered. SR I, Att. 9 at 11 and Second Amended Complaint, Exhibit # 6, 7 of 7. As Ms. Morton explained to Plaintiff, he had not included a facility head response and he had not included the proper documentation which inmates on grievance restriction must provide. Id. Plaintiff's Second Amended Complaint and the Special Report establish that Plaintiff failed to exhaust his administrative remedies regarding this claim which is contained in Count VI of Plaintiff's Second Amended Complaint.

On December 20, 2004, Plaintiff completed a request to staff claiming that GPCF was promoting Christianity by publishing "Season's Greetings" and holiday pamphlets, which gave notice of only Christian religious services. SR I, Att. 10 at 1.  Chaplain Woods

responded to his request to staff. SR I, Att. 10 at 2. On December 30, 2004, Plaintiff filed

a grievance relating to this subject. SR I, Att. 10 at 3 and Second Amended Complaint,

Exhibit # 7, 6 of 6.  Because of procedural errors, the grievance was not processed. SR

I, Att. 10 at 10. Plaintiff sent an appeal of the grievance to ODOC's administrative review

authority, and Ms. Morton assigned number 05-28 to this initial appeal and sent it to

GPCF for review. SR I, Att. 10 at 8-9 and Second Amended Complaint, Exhibit #7, 2 of

6. Ms. Morton instructed Plaintiff that he could appeal the warden's amended response

if he had grounds for appeal once he received the amended response. SR I, Att. 10 at 8.

Plaintiff ultimately submitted a second appeal to ODOC's administrative review

authority, and that unit assigned number 05-430 to the attempted second appeal. SR I,

Att. 10 at 11 and Second Amended Complaint, Exhibit # 7, 1 of 6. However, Plaintiff's

appeal was returned to him unanswered, because he had not included a facility head

response and he had not included the proper documentation which inmates on grievance

restriction must provide. Id. Plaintiff's Second Amended Complaint and the Special

Report establish that Plaintiff failed to exhaust his administrative remedies regarding this

claim, which is contained in Count VII of Plaintiff's Second Amended Complaint.

On January 10, 2005, Plaintiff sent a grievance regarding a claim that GPCF's

chaplain charged him with a misconduct in retaliation for exercising his constitutional

rights. SR I, Att. 11 at 1 and Second Amended Complaint, Exhibit # 8, 3 of 4. The

grievance was returned to Plaintiff because of procedural errors. SR I, Att. 11 at 5 and

Second Amended Complaint, 11 Exhibit # 8, 1 of 4. Plaintiff appealed the grievance to

ODOC's administrative review authority. SR I, Att. 11 at 2 and Second Amended

Complaint, Exhibit # 8, 4 of 4. On February 15, 2005, Director's Designee Debbie Morton returned the grievance appeal to Plaintiff unanswered because he had again contradicted rules and had failed to attach a request to staff or a response from GPCF to his appeal. SR I, Att. 11 at 6 and Second Amended Complaint, Exhibit # 8, 2 of 4. In addition, Ms. Morton extended Plaintiff's grievance restriction through February 14, 2006, because Plaintiff had continued to contradict DOC's grievance policy. SR I, Att. 11 at 6. Plaintiff failed to exhaust his administrative remedies regarding his claim about the chaplain charging him with a misconduct, which is contained in Count VIII of Plaintiff's Second Amended Complaint.

Plaintiff filed a grievance on November 8, 2004, directly to Defendant and then-Director Ward claiming that four days before Eid-ul Fitr, the Feast of Fast Breaking, Defendant Wood and Defendant Calbone informed "us" that they would not be able to purchase Halal meats from a previously-approved Muslim vendor violating his right of religious expression. Second Amended Complaint, p. [14]. Special Report I, Att. 6, p. 2. Defendant Morton returned the grievance unanswered on December 2, 2004, because there was no request to staff, no facility head response to the grievance, and it was not an emergency issue. Id. at 1. She also placed Plaintiff on grievance restriction until December 1, 2005. Plaintiff took no other steps with regard to exhaustion of the issue raised in the returned grievance, which is the subject of Count IX in the Second Amended Complaint.

Plaintiff filed grievance 05-046 alleging that he was denied the opportunity to attend Muslim services and requesting that the prison hire a Muslim chaplain. SR II, Att. 13 at 1. The grievance was returned unanswered because it had been previously addressed and because Plaintiff had used an incorrect form. SR II, Att. 13 at 4. On March 3, 2005, Director's Designee Morton sent a memorandum to OSP (appeal 05-348) requesting an investigation and amended response, and she sent a memorandum to Plaintiff notifying him that she had requested the amended response. SR II, Att. 14 and Att. 15 at 1. Plaintiff appealed the amended response, and the appeal (05-712) was returned unanswered on April 18, 2005 because his grievance contained more than one issue in violation of the grievance policy. SR II, 16 at 1. However, Plaintiff took no other action and failed to exhaust his administrative remedies for this claim which are contained in Count XIV of Plaintiff's Second Amended Complaint.

Plaintiff was transferred back to GPCF on March 3, 2005. SR I, Att. 1 at 1. Plaintiff submitted two grievances (05-62 and 05-98) regarding his earned credit level being lowered. SR I, Att. 29 at 2 and Att. 30 at 2. Plaintiff appealed those grievances to the administrative review authority, and those grievances were returned unanswered because they again failed to comply with policy. SR I, Att. 29 at 1 and Att. 30 at 1. The Special Report demonstrates that Plaintiff failed to exhaust his administrative remedies for these claims, which are contained in Counts XV and XVI Plaintiff's Second Amended Complaint.

Neither Plaintiff's Second Amended Complaint nor DOC's records indicate that Plaintiff ever began the grievance process regarding a claim that GPCF refused to pay him back pay. See Second Amended Complaint, Exhibits; SR I and SR II.  Plaintiff responds that he spoke to "Ms. Collier" the "DOC Monitor" who told him this issue was a private prison issue upon which the ODOC could not grant relief. Plaintiff's Response to [First] Motion to Dismiss, p. 5. He claims he sent a request to staff to the deputy warden who did not respond, and has attached a copy of a request to staff directed to "Ms. Z. Jacques, AWO." Id. at Ex. 1, p. 4. He claims that he then sent a grievance to Defendant Calbone who denied relief, and a copy of this grievance is attached to his response. Id. at p. 2, 3. However, he claims that instead of appealing to the ODOC Director, he then sent a letter to David Cornell, "owner of GPCF," who did not respond. Thus, Plaintiff failed to complete the exhaustion process by appealing to ODOC and failed to exhaust his administrative remedies regarding this claim which is contained in Count XVII of Plaintiff's Second Amended Complaint.

Defendant Ward was not directly involved in the events at OSP about which Plaintiff complains.  *See* Doc. 78, SR II, Atts. 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22. He did not review or respond to any of the requests to staff, grievances, or grievance appeals.  Id.

Defendant Morton's only involvement in Plaintiff's issues was in reviewing and responding to Plaintiff's grievance appeals and determining whether Plaintiff had submitted sufficient cause to overturn others' decisions regarding his grievances. See Doc. 78, SR I, Att. 4 at 5, Att. 8 at 7, Att. 6 at 1, Att. 7 at 6, Att. 9 at 8-9, Att. 9 at 11, Att.

10 at 8-9, Att. 10 at 11, Att. 11 at 6, Att. 29 at 1, Att. 1 30 at 1;  Doc. 78, SR II, Att. 5 at 1, Att. 8 at 1, Att. 12, Att. 20, Att. 21, Att. 22 at 1, Att. 14, Att. 15,and Att. 16 at 1. Defendant Guilfoyle did not respond to or review any of Plaintiff's grievances or grievance appeals, and Plaintiff has failed to demonstrate that she was involved in any matters relating to this lawsuit.  <u>See</u> Doc. 78.

Defendants Richard Kirby, former ODOC General Counsel, and Ron Anderson, ODOC Assistant General Counsel, had no direct or personal involvement in the events about which Plaintiff complains which occurred at GPCF or at OSP.  <u>See</u> Doc. 78, SR I, Doc. 78.  The duties of the General Counsel and Assistant General Counsel are to provide representation and legal advice to ODOC staff.  Supp. SR, Attachment (Att.) 14.  The General Counsel and Assistant General Counsel have no authority to direct daily operations of OSP.  <u>Id.</u>

Defendant Franzese's only involvement was in responding to Plaintiff's requests to staff.  Doc. 78, SR II, Att. 5 at 3, Att. 8 at 3, Att 11, Att 15 at 2, Att. 16 at 6, Att. 21 at 3, and Att. 22 at 3. Defendant Mullin's only involvement was in responding to Plaintiff's grievances.  Doc. 78, SR II, Att. 3, Att. 5 at 2, Att. 7, Att. 8 at 2, Att. 10, Att. 12 at 2, Att. 19, Att. 21 at 4.  Defendant Harvanek's only involvement was in responding to one grievance.  Doc. 78, SR II, Att. 22 at 5.

Regarding the GPCF claims for which Plaintiff exhausted his administrative remedies (Counts I, II, III, IV, and V), the incidents were specific to GPCF occurrences and/or were based on GPCF practices; the DOC Defendants did not personally or directly participate in these specific events.  <u>See</u> Doc. 78, SR I, Att. 2 at 2 (GPCF's attempts to

14

locate an Imam and GPCF staff's encouragement that Plaintiff attempt to do so); Att. 3 at 2 (GPCF's investigation into Plaintiff's allegations that GPCF was placing pudding/jello containing pork products on his tray); Att. 4 at 4 (GPCF's response about specific requests which had been made to GPCF staff regarding a Christian revival); Att. 7 at 4 (GPCF's response regarding GPCF's practices at Ramadan). Document 77, Exhibit 2 indicates that GPCF – not ODOC – set its own policy regarding the number of visitors each inmate could have. Doc. 77, Exhibit 2 at 4.

Plaintiff was temporarily transferred to OSP on January 27, 2005 to attend his civil trial. Supp. SR, Atts. 1 and 2. He was incarcerated there from that date until March 3, 2005. Id.

OSP's religious policy OSP-030112-01, entitled "Religious Programs," states that the prison seeks to accommodate the religious requests of all inmates, provided the requests do not conflict with penological goals. See Doc. 78, SR II, Att. 18 at 1. OSP's policy is consistent with ODOC's policy OP-030112, entitled "Religious Services." Doc. 78, SR II, Att. 4 at 1.

The chaplains ODOC hires are required by the Oklahoma Personnel Act to apply for, be qualified for, and compete with other applicants for employment. Supp. SR, Att. 9. Applicants are considered for the position without regard to their religious affiliation. Id. According to Leo Brown, ODOC Agency Chaplain and Volunteer Coordinator, he recalls only one non-Christian ever applying for a chaplain position within the past five years. Id. That person was hired at the Oklahoma State Reformatory and served there as chaplain from December 2004 until December 2006, when he applied for and was hired

15

as the Program Coordinator for the Faith and Character Community Program at the Oklahoma State Reformatory. Id. ODOC's chaplains are trained in the religious practices of all faiths and serve as chaplain to all faiths represented in the prisoner population. Id.

Chaplains do not conduct religious services of a specific faith but facilitate and coordinate the services of all faiths at the facilities. Supp. SR, Att. 9. ODOC does not provide any prisoner with a religious leader for their specific faith group. Id. Chaplains attempt to recruit volunteer religious leaders from all faiths represented in the prison population. Id.. ODOC has specifically made efforts to recruit Muslim volunteers, and the agency currently has Muslim volunteers serving at several prison facilities. Id.

Volunteers typically organize and sponsor religious services and events. Id. Some facilities allow religious activities or special events organized by prisoner faith groups, and this opportunity to hold such activities and events is open to all faith groups at those facilities. Id.

Policy provides that all religious activities will be included in calendars posted within the prisons. Supp. SR, Att. 9.  When scheduling group meetings, chaplains must consider factors such as the security level of the facility, the size of the faith group, the needs of the group, space limitations, and the availability of a volunteer to supervise the event. Id.

ODOC does not prepare or provide food for religious ceremonies. Supp. SR, Att. 9. Policy permits prisoners to purchase or have food with established religious significance donated from outside religious organizations. Id.  Muslim prisoners are

permitted by policy to purchase Halal meats and traditional sweets for Eid feasts or to have them donated. Id.

ODOC's policy entitled "Religious Services" provides that "[a]ll religious restricted meals will be offered through a common pork-free or meat free meal or kosher diet. An inmate who wishes to receive one of these diets for religious reasons must submit a "Special/Religious Diet Request Form" . . . to the facility food service supervisor." Doc. 78, SR II, Att. 4 at 7, § VI.A. *See also*, Supp. SR, Att. 10 (OSP provides a pork-free diet to Muslim inmates who request such a diet.). OSP prison staff never received any "Special/Religious Diet Request" from Plaintiff even after he was advised of the availability of the vegetarian and non-pork diets. Supp. SR, Atts. 11 and 12.

In a request to staff, Plaintiff requested a Halal diet containing only grain-fed animals, slaughtered pursuant to his specifications, and food devoid of steroids or "doubtful" substances for the short period of time he was to be incarcerated at OSP. Doc. 78, SR II, Att. 5 at 3. Defendant Franzese, the chaplain, informed him that a non-pork diet and a vegetarian diet were both available and referred Plaintiff to the policy which explained how to request either diet. Id. However, as noted above, Plaintiff failed to submit such a request. Supp SR, Atts. 11 and 12.

All hardback books, regardless of the content of the books, are contraband at OSP, the state maximum prison. Supp. SR, Att. 6. Prisoners have used hard back books as weapons and have used them to hide contraband, either in the binding or in the cover. Supp. SR, Att. 7. This restriction does not apply to books without hard covers, so prisoners are entitled to possess books without hard covers. Supp. SR, Att. 6.

Pursuant to OSP's policy, Plaintiff's hardback books were taken from him when he arrived at OSP. Supp. SR, Att. 3. Plaintiff remained at OSP for only thirty-five days. Doc. 78, SR I, Att. 1 at 1. Plaintiff was advised how he could obtain a Qur'an which did not have a hard cover while he was at OSP. Supp. SR, Att. 8.  Such books can be ordered or donated.  Id.

OSP's and ODOC's policies provide that state funds may not be used to purchase religious items for **any** religion. Doc. 78, SR II, Att. 4 at 8; SR II, 18 at 2; Supp. SR, Atts. 9 and 10. However, OSP's policy did not prevent Plaintiff or other prisoners from obtaining the religious literature or items they required (other than those items which were prohibited for security or other valid reasons). Id. Inmates are free to use their own or donated money for obtaining religious literature or other items and could receive religious guidance through volunteers. Doc. 78, SR II, Att. 18 at 10; Supp. SR, Atts. 9 and 10. ODOC staff seek donations and volunteers. Supp. SR, Att. 8.

ODOC does not pay the Christian leaders or other religious leaders. Doc. 78, SR II, Att. 4 at 2, Att. 10, and Att. 18 at 2-3. These religious leaders are volunteers. Id. In a response to Plaintiff's grievance, Defendant Mullin explained to Plaintiff that OSP could not employ religious leaders but that the facility had attempted to locate a volunteer Muslim religious leader to provide services at OSP. Doc. 78, SR II, Att. 10. Warden Mullin encouraged Plaintiff to attempt to help locate such a leader. Id. Chaplain Franzese also encouraged Plaintiff to do so. Doc. 78, SR II, Att. 11 and Att. 15 at 2.

OSP's religious policy indicates that ODOC recognizes Islam and provides several methods for Muslim prisoners to practice their faith. Doc. 78, SR II, Att. 18 at 7 and 8. At

OSP, Muslim prisoners are given opportunities to practice Islam, including a non-pork and/or vegetarian diet (Doc. 78, SR II, Att. 18 at 7), the observance of Ramadan (Doc. 78, SR II, Att. 18 at 8), special Halal foods for Eid celebrations (Doc. 78, SR II, Att. 18 at 7-8), daily prayer, and the participation in Jumu'ah prayer (Doc. 78, SR II, Att. 18 at 7). In addition, prisoners may possess the Qur'an and other Islamic literature (assuming the books do not contradict security rules). Doc. 78, SR II, Att. 18 at 9-10.  Although OSP and ODOC do not use state funds to employ a religious leader or to purchase religious literature or religious accessories, the use of volunteer Islamic leaders is encouraged and accommodated, as is the prisoner's purchase of religious literature or accessories. Doc. 78, SR II, Att. 18 at 4-5 and 10.

At the time Plaintiff was incarcerated at OSP, OSP had received few volunteers from the Islam faith to provide guidance and had received few donations of literature or items (*see* Doc. 78, SR II, Att. 10, Att. 11, Att. 15 at 2). Plaintiff was encouraged to assist in locating volunteers and in obtaining donations. Doc. 78, SR II, Atts. 10, 11, 15 at 2, 19.

Plaintiff filed a previous lawsuit, *Abdulhaseeb v. Oklahoma Department of Corrections*, et al., CIV-98-0296, United States District Court for the Eastern District of Oklahoma, in which he asserted that ODOC had treated Muslim inmates differently from Christian inmates, that prison officials attempted to make Christianity the official ODOC religion, and that prison officials hired only Christian religious leaders. *See* DOC Defendants' Motion to Dismiss/Motion for Summary Judgment, Exhibit 2. In that case, Plaintiff was afforded a trial on the merits, and judgment was granted in favor of ODOC and the DOC Defendants named in that action. See Id. at Exhibit 3.

19

Defendant Morton, who is employed in ODOC's Administrative Review Unit, rejected only Plaintiff's grievance appeals which failed to comply with the grievance policy. Doc. 78, SR I, Att. 6 at 1, Att. 7 at 6, Att. 9 at 11, Att. 10 at 11, Att. 11 at 6, Att. 29 at 1, Att. 30 at 1, Doc. 78, SR II, Att. 5 at 1, Att. 12, Att. 16 at 1. Because Plaintiff repeatedly submitted grievance paperwork which failed to comply with policy, he was placed on grievance restriction. Doc. 78, SR I, Atts. 6 at 1, 11 at 6, 18 at 7, and 25 at 8. According to the grievance policy, inmates who continually file grievances which violate policy or who attempt to harass staff through the grievance procedures by filing numerous grievances may be placed on grievance restriction. Doc. 77, Exhibit 1 at 10-11, § IX.A.   Once Plaintiff was on grievance restriction, he was still permitted to file grievances, but he was then required to follow the instructions in IX.B.2.   Doc. 77, Exhibit 1 at 11, § IX.B.2.

Plaintiff filed a similar lawsuit in which he asserted that ODOC's alleged refusal and/or inability to provide the specific Muslim diet he requested violated the Free Exercise Clause of the First Amendment. Abdulhaseeb v. Beasley, CIV-03-1404-W, slip op. at 27-28 (W.D. Okla. Oct. 31, 2005) (M.J. Roberts) adopted slip op. at 3-4 (W.D. Okla. Jan. 17, 2006) (J. West), appeal pending, Case No. 07-6270 (10th Cir. Nov. 16, 2007) Ex. 1 at 24, DOC Defendants' Motion to Dismiss.   The issues were determined against Plaintiff in that case. Id,

## III.  MOTION OF DOC DEFENDANTS

### A.  FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

At the outset DOC Defendants renew an argument made in support of an earlier motion to dismiss, in which they contend that Plaintiff has failed to exhaust his administrative remedies with regard to several of the claims raised herein.   The undersigned notes that both the Cornell Defendants and the Canteen Defendants join with the DOC Defendants in this ground for summary judgment.  In a previous Report and Recommendation, the undersigned recommended that Plaintiff's action be dismissed as it appeared that he had failed to exhaust some of his claims.  However, shortly after that Report and Recommendation was entered, the United States Supreme Court reached its decision in Jones v. Bock, 127 S.Ct. 910 (2007), holding that the burden of demonstrating a plaintiff's failure to exhaust administrative remedies rests on defendants.  Additionally, the Supreme Court concluded that when a district court is presented with a complaint containing both exhausted and unexhausted claims, the district court should employ the "more typical claim-by-claim approach" and dismiss only those claims which are not exhausted.  Id. at 926.   Accordingly, Judge West re-referred the matter so that the issue could be revisited in light of the Jones decision.  The undersigned reviewed the motion to dismiss and found that it was based upon principles that were no longer valid in light of Jones, and recommended that it be denied without prejudice to the DOC Defendants' right to raise the failure to exhaust as an affirmative defense in accordance with Jones.  [Doc. No. 105].  That Report and Recommendation was adopted by Judge West, and the matter was re-referred for further proceedings. [Doc. No. 113].

The DOC Defendants have now affirmatively undertaken their evidentiary burden to demonstrate that prior to filing his action, Plaintiff failed to complete the steps of the grievance procedure. DOC Defendants have supplemented the special report and raised the issue of exhaustion with regard to the claims raised in Counts VI, VII, VIII, IX, XIV, XV, XVI, and XVII.   They claim that the prison system's procedural requirements themselves determine whether a grievance was properly submitted, and that Plaintiff failed to exhaust his remedies in compliance with ODOC's grievance policy. DOC Defendants have incorporated the facts numbered 1-25 from their previous motions to dismiss [Doc. Nos. 77 and 81] as well as the argument and authority pertaining to exhaustion contained therein.   Plaintiff  adopts his response to the DOC Defendants' previous motion to dismiss on grounds of exhaustion, as well as his objections to the undersigned's Report and Recommendation.   Plaintiff has also made a declaration in opposition to the current motion to dismiss.  Ex. A, Response to Motion to Dismiss.

In Jones, the Supreme Court determined that failure to exhaust is an affirmative defense under the PLRA, that inmates are not required to specially plead or demonstrate exhaustion in their complaints, that inmates must no longer demonstrate that each and every one of the claims in the complaint have been exhausted,  and the failure to exhaust one claim does not result in the dismissal of them all. Id. at 921, 923-26.  However, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Id. at 918-19 (citing Porter v. Nussle, 534 U.S. 516, 524 (2002)).

22

### 1. Count VI – Posting of Christian Fliers

In Count VI, Plaintiff complains that Defendants substantially burdened his expression of freedom of religion by establishing Christianity as the State religion. Second Amended Complaint, p. [13].  DOC Defendants have submitted a copy of a request to staff submitted by Plaintiff to Defendant Chaplain Wood on December 20, 2004, complaining about the posting of fliers around the prison announcing Christian services;  Defendant Wood responded two days later indicating that the following practice would go into effect on January 1, 2005: "No religious group shall post notices of specific religious services anywhere in the facility unless authorized by the facility head or designee." See DOC Defendants' [First] Motion to Dismiss, p. 8; Special Report I, Att. 9, p. 1-2.  Plaintiff then submitted a grievance to Defendant Warden Calbone on December 30, 2004. Id.; Special Report I, Att. 9, p. 3. The grievance was returned unanswered, and a memo from Defendant Haskins, grievance coordinator, indicates that it was returned because "inmate on grievance restriction and/or proper documentation not included." Special Report I, Att. 9, p. 7. Plaintiff appealed, and Defendant Morton, Director's Designee, assigned a number and returned the grievance to GPCF on January 27, 2005, for further review and investigation. DOC Defendants' [First] Motion to Dismiss, p. 8; Special Report I, Att. 9, p. 4, 9. Plaintiff was instructed he could appeal the warden's amended response. Special Report I, Att. 9, at 8. On February 9, 2005, Defendant Haskins sent a memo to Plaintiff explaining that his grievance had been returned because his affidavit did not contain all of the grievances filed with GPCF within the last year. Special Report I, Att. 9, p. 10. Plaintiff appealed again, adding to the language on his first

appeal, and a second appeal number was assigned. Special Report I, Att. 9, p. 13-14. This appeal was also returned unanswered with three reasons checked on a preprinted form, including: "no facility head response to the grievance; inmate on grievance restriction and/or proper documentation not included; other, You must follow instructions per OP-090124 section IX."8 Special Report I, Att. 9, p. 11.

Plaintiff responds that at the time he filed his grievance, his affidavit did list all grievances filed to date, and that Defendants relied on grievances filed after that date to allege that he had not complied with the requirements for inmates placed upon grievance restriction. Plaintiff's Response to DOC Defendants' [First] Motion to Dismiss, p. 7. He also alleges that Defendant Morton sent Defendant Dishman a "secret memo ex parte" informing him that he was to amend his response to allege the "defense" regarding Plaintiff's failure to comply with the grievance restriction requirements. Id.  p. 7-8. Finally, he contends that although Defendant Morton returned the appeal and called for an amended response from the facility head, and informed him that he could appeal from the warden's amended response, she then dismissed the appeal because of the lack of a facility head's response and due to the grievance restriction. He claims that Defendants "concocted non-existent procedural roadblocks to prevent him from having access to the courts on his meritorious claims...." Id. at 8.

The undersigned finds that Plaintiff's efforts to exhaust the claim contained in Count VI is governed by Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002). "An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under [the] PLRA for failure to exhaust his administrative

remedies." Id. In addition, inmates must properly follow the grievance procedure and correct deficiencies along the way. Id. Even when prison authorities are incorrect about the existence of the perceived deficiency, the inmate must follow the prescribed steps to cure it. See Jernigan, 304 F.3d at 1032 ("[W]e reject Mr. Jernigan's assertion that "[i]nmates do not have to properly complete the grievance process, and they do not have to correct deficiencies." [citation omitted]]). Plaintiff's disagreement with prison officials as to the appropriateness of a particular procedure under the circumstances, or his belief that he should not have to correct a procedural deficiency does not excuse his obligation to comply with the available process:

> In order to exhaust administrative procedures, the inmate must see the grievance process to its conclusion; the doctrine of substantial compliance does not apply, and there is no exception for when the inmate fails to cure a procedural deficiency or neglects to employ available internal processes before the time expires for pursuing them.

Johnson v. Wackenhut Corrections Corp. No. 04-6245, 130 Fed. Appx. 947, 949-950 (10th Cir. May 11, 2005).[5] Thus, although Plaintiff may not have felt it necessary to supplement his grievance with subsequently filed grievances in order to comply with the grievance restriction requirements, the ODOC administration did, and he was obligated to employ that process in order to exhaust his remedies. In his objection to the undersigned's Report and Recommendation, Plaintiff's declaration, and even his most recent response to the DOC Defendants' motion, he continues to argue regarding the appropriateness of the prison administration's interpretation of its policy, but does not dispute the fact that he failed to comply with that policy as interpreted. Instead, Plaintiff claims that the DOC

---

[5]This and any other unpublished decision is cited solely for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Defendants are equitably estopped from requiring exhaustion because they added vague, unwritten, technically complex procedures. Plaintiff's Response to DOC Defendants' Motion to Dismiss/Motion for Summary Judgment, p. 12. The Tenth Circuit Court of Appeals has not decided whether to apply the doctrine of equitable estoppel in the context of administrative exhaustion under 42 U.S.C. § 1997e(a) (2000). See Jernigan v. Stuchell, 304 F.3d 1030, 1033 (10th Cir. 2002) (declining to decide whether the doctrine of equitable estoppel applies to an issue involving administrative exhaustion). But, recognition of the doctrine would require Plaintiff to demonstrate misrepresentation, reasonable reliance on the misrepresentation, and detriment. See Hoover v. West, No. 03-7106, 93 Fed. Appx. 177, 182 (10th Cir. Feb. 19, 2004) (if doctrine applies, plaintiff would have to show misrepresentation by the defendants, reasonable reliance on the misrepresentation, and detriment). Here, Plaintiff's failure to comply with the administration's request to supplement the administrative request makes it clear there was no reliance on his part. Thus, equitable estoppel would not be appropriate even if it were applicable to the administrative remedy process. Thus, the undersigned finds the claim contained in Count VI to be unexhausted.

### 2. Count VII – Season's Greetings Pamphlet

In Count VII, Plaintiff claims that GPCF's publication of a Season's Greetings pamphlet burdened his religious expression and established Christianity as the State religion. Second Amended Complaint, p. [11]. On December 20, 2004, Plaintiff sent a request to staff to Defendant Wood complaining that publishing a Season's Greetings pamphlet listing only Christian services promoted Christianity. Special Report I, Att. 10,

p. 1. Chaplain Wood responded two days later, explaining that the pamphlet only contained services sponsored by outside volunteer groups, and that his request for recall of the pamphlet was beyond Defendant Wood's authority and would have to be directed to Defendant Calbone.   Id. at 2. Plaintiff filed a grievance on December 30, 2004, Id. at 3, but it was returned because "inmate on grievance restriction and/or proper documentation not included." Id. at 7. Plaintiff appealed to the Director of the ODOC, claiming that he had complied with the grievance restriction procedure. Special Report I, Att. 10, p. 4-5. Plaintiff was then instructed by a memo from Defendant Morton that his grievance had been "forwarded ... to the facility head at Great Plains Correctional Facility for further review and investigation." Id. at 8. He was further instructed that if "after receiving and reviewing the amended response, you have grounds for appeal as specified in OP-090124 entitled Inmate/Offender Grievance Process, Section VII, A. Grounds for Appeal, you may do so within guidelines stipulated in policy." Special Report I, Att. 10, p. 8. A memo was sent to Defendant Calbone at the same time stating that it "appears that the offender's appeal was not accepted at the facility due to the inmate's failure to comply with OP-090124 entitled Grievance Procedures. If the inmate has failed to comply with the procedures he must start with the facility. If he has complied the facility head should respond." Id. at p. 9. Thereafter, Plaintiff received a memo from Defendant Haskins informing him that his grievance "was returned due to the affidavit not containing all grievances filed to GPCF within the last year." Id. at p. 10. Plaintiff appealed this amended response, and it was returned by Defendant Morton with a preprinted form upon which the following deficiencies were checked: "1. no facility head response to the

grievance; 6. inmate on grievance restriction and/or proper documentation not included; Other: "you must properly follow instructions in Section IX of OP-090124." Id. at p. 11, 13-14. Thus, DOC Defendants contend that Plaintiff has failed to exhaust his administrative remedies with regard to Count VII.

As with the previous claim. Plaintiff responds that at the time he submitted his grievance, his affidavit noted all grievances within the previous twelve months. Plaintiff's Response to DOC Defendants' [First] Motion to Dismiss, p. 8. He contends that Defendants Calbone and Haskins returned the grievance without a reason, and that Defendant Morton then sent a memo and/or called the grievance coordinator "ex parte" in order to supply a pretextual reason to use in the amended response, i.e. Plaintiff not providing all grievances over the last twelve months in his affidavit. He claims that Defendant Morton "arbitrarily returned the grievance unanswered" following his second appeal. Id. at 9. He does not deny that he did not attempt to address the deficiencies noted in either the memo from Defendant Haskins accompanying the returned grievance or on the form memo accompanying the return of his second appeal. Rather, he claims that the deficiencies were pretextual and/or incorrect factually. Rather than correcting the grievance's deficiencies, Plaintiff instead appealed the facility's decision to return it unanswered, and then did nothing after the response by Defendant Morton noted the same deficiency. Thus, the undersigned finds that the claim raised in Count VII is unexhausted.

### 3.  Count VIII – Retaliatory Misconduct Action

In Count VIII, Plaintiff claims that Defendant Wood retaliated against him for filing the requests to staff regarding the posting of fliers and the publication of the Season's Greetings pamphlet. Second Amended Complaint, p. [14]. On January 10, 2005, Plaintiff sent a grievance to Defendant Calbone claiming that Defendant Wood retaliated against him for submitting the two requests to staff on December 20, 2004. Special Report I, Att. 11, p. 1. The grievance was returned by Defendant Haskins because "Inmate on grievance restriction and/or proper documentation not included." Id. at 5. Plaintiff appealed, claiming that the grievance coordinator erred by not providing a specific written reason for returning his grievance, and he attached a page detailing his efforts to prepare and submit his request to staff. Id. at 3. The appeal was returned by Director's Designee Morton because there was no request to staff and no facility head response. Id. at 6.

In his response, Plaintiff claims that he had prepared a request to staff to Defendant Deputy Warden Smith and had received a response denying relief, and that he had placed the request to staff in the envelope with his grievance. Plaintiff's Response to DOC Defendants' [First] Motion to Dismiss, p. 9. He also claims that the facility received it, and that the lack of a request to staff was therefore not a reason for return of the grievance. Id. He claims that those "treacherous, unprincipled, dishonest, arrogant, satanic-inspired individuals do not include copies of the request to staff in their special report even though Travis Smith and the grievance coordinator were required to keep copies of the request to staff." Id. He claims that Defendants "attempted to murder Plaintiff on lockup and sabotaged his grievance." Id. at 10. He claims that it was the Defendant Morton who raised the "defense" of "no request to staff" for the first time (but

29

he does not explicitly claim he submitted one with his appeal). Despite these numerous claims, Plaintiff does not claim that he attempted to correct the deficiency noted by the Director's Designee. Under <u>Jernigan</u>, he is required to make an effort to correct the deficiency noted and complete the exhaustion process, even if the deficiency noted was in error. The undersigned thus finds that Plaintiff has failed to exhaust his administrative remedies with regard to Count VIII.

### 4.   Count IX – Denial of Halal Meats for Eid-ul Fitr

In Count IX, Plaintiff claims that four days before Eid-ul Fitr, the Feast of Fast Breaking, Defendant Wood and Defendant Calbone informed "us" that they would not be able to purchase Halal meats from a previously-approved Muslim vendor violating his right of religious expression. Second Amended Complaint, p. [14]. Plaintiff filed a grievance that same day, November 8, 2004, directly to Defendant and then-Director Ward. Special Report I, Att. 6, p. 2. Defendant Morton returned the grievance unanswered on December 2, 2004, because there was no request to staff, no facility head response to the grievance, and it was not an emergency issue. <u>Id.</u> at 1. She also placed Plaintiff on grievance restriction until December 1, 2005. Plaintiff took no other steps with regard to exhaustion of the issue raised in the returned grievance. Plaintiff responds that grievances may be submitted directly to the reviewing authority without informal resolution when the issue is of a sensitive nature or when there is substantial risk of personal injury or other irreparable harm exists. Plaintiff's Response to DOC Defendants' [First] Motion to Dismiss, p. 3 (citing OP-090124.VIII.A). He claims that he was correct in using the emergency grievance procedure because the matter involved the warden and

30

the chaplain. Id. at 4. He claims that Defendant Morton did not inform him he could use the standard grievance process and acted arbitrarily by placing him on grievance restriction. Id. The undersigned finds that Plaintiff has failed to exhaust his administrative remedies with regard to this issue. Although Plaintiff complains that he was not told to pursue the standard process, the memo cites to the provision applicable to inmates on grievance restriction.  Special Report I, Att. 6, p. 1. There is no evidence that Plaintiff pursued that process with regard to this issue, and the undersigned finds it to be unexhausted.

### 5.  Count XIV – Al Jumu'ah Prayer at OSP

In Count XIV, Plaintiff claims that "Defendants substantially burdened my expression of freedom of religion by not providing me with an opportunity to attend and participate in congregational Al-Jumu'ah Congregational Prayers or any other Islamic religious services...." Second Amended Complaint, p. [19].  On February 6, 2005, Plaintiff filed a request to staff with Defendant Chaplain Franzese complaining about the lack of Friday Islamic services on his unit at OSP, and requesting permission to attend and/or conduct services in the gym. Special Report II, Att. 15, p. 2. Defendant Franzese responded the following day. Id. On February 8, 2005, Plaintiff filed a grievance with Defendant Mullin. Special Report. II, Att. 13, p. 1. The grievance was returned to Plaintiff unanswered for two reasons: that it was duplicative of a grievance requesting a paid spiritual leader, and that it was on the wrong form. Id. at p. 4. Plaintiff appealed, and Defendant Morton sent a memo to Defendant Mullin requesting investigation and an amended response, noting that the previous grievance was the lack of a paid Imam and

the current grievance was concerning Plaintiff's inability to attend Friday Islamic services. Id. at Att. 14. Plaintiff was also informed by memo that the grievance was being sent to Defendant Mullin for further review and investigation. Id. at Att. 15. Defendant Mullin again returned the grievance unanswered, citing the same two reasons given before and adding "More than one issue raised. Each grievance form submitted may address only one issue." Special Report II, Att. 16, p. 4. Plaintiff appealed this as well, but his appeal was also returned unanswered because it contained more than one issue. Id. at Att. 16, p. 1. Plaintiff did not attempt to correct the noted deficiency, and took no other action with regard to his claim until this litigation was filed.

Plaintiff responds that "the treacherous, anti-justice, anti-constitution of America quasi-judicial official Morton" called Defendant Mullin and informed him that the grievance contained two issues so he could give that as the reason for his subsequent amended response. Plaintiff's Response to DOC Defendants' [First] Motion to Dismiss, p. 12.  He also claims that she knew he only wanted to raise one issue, and that because of her official misconduct, she "cannot rely upon failure to exhaust administrative remedies interfered with by her to prevent Plaintiff from having his day in Court." Id. However, Plaintiff does not claim that he resubmitted his grievance to correct any of the deficiencies noted by either Defendant Mullin or Defendant Morton – in particular, that he ever resubmitted the grievance on the proper form or to omit multiple requests. Plaintiff's failure to attempt to cure the deficiencies noted shows that he has indeed failed to complete the administrative process with regard to the issue raised in Count XIV and the undersigned finds it to be  unexhausted.

32

**6.   Counts XV and XVI – Failure to Promote to Higher Classification Level**

In Counts XV and XVI Plaintiff claims that he was not promoted to higher earned credit levels following a decision to dismiss the misconduct conviction he received for disrespect to staff (which forms the basis of his claim in Count VIII) after a rehearing had been ordered. Second Amended Complaint, p. [19]. Plaintiff transferred back to GPCF on March 3, 2005. Plaintiff submitted a request to staff to Case Manager Alexander on April 18, 2005, requesting immediate promotion to level two, and that request was denied on April 21, 2005. Special Report I, Att. 29, p. 6. He then submitted a grievance to Defendant Calbone, and the grievance was returned for the reason that "Inmate on grievance restriction and/or proper documentation not included." Id. at 2, 8. Plaintiff then appealed, and Defendant Morton returned it for the following reasons: "no facility head response to the grievance"; "inmate on grievance restriction and/or proper documentation not included see below"; "Other Affidavit not completed properly per OP-090124 section IX.B.2.a". Id. at 1.

On July 29, 2005, Plaintiff filed a request to staff to Case Manager Alexander requesting that his earned credits be restored, that his performance rating of poor be raised to good, and that he be promoted to level three as of February 1, 2005, and to level four as of June 2005. Id. at Att. 30, p. 5. Relief was denied, and he filed a grievance with Defendant Calbone on August 15, 2005. Id. at 2. The grievance was returned for the reason that "Inmate on grievance restriction and/or proper documentation not included." Id. at 8. Plaintiff then appealed, and Defendant Morton returned it with the following reasons noted: "inmate on grievance restriction and/or proper documentation not

included affidavit improperly completed; Other please review OP-090124 section IX.B.2.a." Id. at 1. Plaintiff took no other action regarding the earned credits issue, and it is the DOC Defendants' position that neither of Plaintiff's claims regarding his earned credit levels are exhausted.

In his objection to the undersigned's previous Report and Recommendation recommending dismissal of these claims for lack of exhaustion, Plaintiff states that Defendants did not "explain" to him what they meant and that he could never find any defects in his administrative materials.  Plaintiff's Objection to Magistrate's Report and Recommendation, p. 11-12. [Doc. 101].  However, in her memos returning Plaintiff's appeals, Defendant Morton specifically cited OP-090124(IX)(B)(2)(a), which provides:

> The inmate/offender will submit a duly verified affidavit, made under penalty *of discipline for lying to staff*, attached to the grievance stating that all contents of the grievance are true and correct to the best of the inmate's/offender's knowledge and belief.  The affidavit will also contain list by grievance number, date, *description*, and disposition at each level, of all grievances previously submitted by the inmate/offender within the last 12 months.

Ex. 1, DOC Defendants' [First] Motion to Dismiss (OP-090124 Inmate/Offender Grievance Process) (emphasis added).  Neither of the affidavits submitted by Plaintiff satisfy this requirement. Accordingly, the undersigned finds that neither of these issues have been exhausted due to Plaintiff's failure to cure the noted procedural defect, and the claims in Counts XV and XVI are therefore not exhausted.

### 7.  Count XVII – Special Pay

In Count XVII, Plaintiff claims that he was denied equal protection when Defendants refused him special pay allegedly paid to similarly-situated inmates. Second Amended Complaint, p. [20]. DOC Defendants claim that there are no ODOC records indicating that Plaintiff ever began the administrative process regarding this claim. DOC Defendants' [First] Motion, p. 15.  Plaintiff responds that he spoke to "Ms. Collier" the "DOC Monitor" who told him this issue was a private prison issue upon which the ODOC could not grant relief. Plaintiff's Response to [First] Motion to Dismiss, p. 5. He claims he sent a request to staff to the deputy warden who did not respond, and has attached a copy of a request to staff directed to "Ms. Z. Jacques, AWO." Id. at Ex. 1, p. 4. He claims that he then sent a grievance to Defendant Calbone who denied relief, and a copy of this grievance is attached to his response. Id. at p. 2, 3. However, he claims that instead of appealing to the ODOC Director, he then sent a letter to David Cornell, "owner of GPCF," who did not respond. He claims that under OP-090124.II.B.1, his special pay claim is not an issue grievable to ODOC, and refers the Court to ODOC's response to a grievance on an unrelated issue in which "private prison issue" is underlined as one of four reasons his grievance appeal was returned. See Second Amended Complaint, Ex. 5, p. 4.  In his objection to the earlier Report and Recommendation, Plaintiff claims that Ms Jacques "missed the statute of limitations" when she failed to respond to his request to staff, rendering administrative remedies unavailable.  Plaintiff's Objection to Magistrate's Report and Recommendation, p. 13 [Doc. 101].  He also claims that he relied on the advice of the "DOC Monitor" to his detriment in not appealing to the director.  Id. at 14.

The undersigned is not persuaded that Plaintiff has exhausted his administrative

remedies with regard to this claim. First, the provision cited by Plaintiff provides that *misconduct* reports cannot be appealed through the grievance system. See DOC Defendants' [First] Motion to Dismiss, Ex. 1, p. 2 (OP-090124.II.B.1). Perhaps Plaintiff believes this provision to be applicable because one of the reasons given by Warden Calbone for the denial of special pay was Plaintiff's demotion to a lower classification level following a misconduct conviction, but the issue being grieved is not the misconduct (the subject matter of which is not even referenced in the grievance materials) but his special pay. Moreover, his claim that the special pay issue was a private prison issue upon which the ODOC could not grant relief is simply not supported by the ODOC grievance policy (with which Plaintiff is obviously well-versed), nor the forms themselves. The grievance form he submitted on this very issue directs that "You may appeal to the director or medical director or designee at Department of Corrections ...." Plaintiff's Response to  DOC Defendants' [First] Motion to Dismiss,  Ex. 1, p. 2. Plaintiff's claim that he did not know he needed to proceed to the next level in order to exhaust is not legally sufficient, and the undersigned finds the claim raised in Count XVII to be unexhausted.

To summarize, the undersigned finds the claims in Counts VI, VII, VIII, IX, XIV, XV, XVI, and XVII to be unexhausted. Thus, it is recommended that these counts be dismissed without prejudice for Plaintiff's failure to exhaust his administrative remedies with regard to these claims.

### B.  Personal Participation/Affirmative Link

Next, the DOC Defendants move for summary judgment on grounds that Plaintiff has failed to link any DOC Defendant to a violation of his federally protected rights. They claim that it is well-settled that personal participation is an essential element of any claim against an official for a constitutional deprivation, and without such a link there is no liability. DOC Defendants' Motion, p. 11.

First, Defendant Ward contends that Plaintiff's claims that he deprived him of spiritual guidance, a spiritual leader, religious services, a religious diet, a Holy Qur'an and other religious materials, and that he established Christianity as the State religion are supported by nothing other than conclusory, self-serving allegations. Id. He claims that the special report shows that he was not directly involved in the events at the Oklahoma State Penitentiary (OSP) and that he did not review or respond to any of Plaintiff's requests to staff, grievances, or grievance appeals. Id. at 11-12. He further claims that Plaintiff cannot demonstrate that he supervised or exercised control over any individual at GPCF or staff at OSP, or over Defendant Morton or any other individual's "limited" involvement in reviewing Plaintiff's grievance appeals. Id. at 12.

Plaintiff responds with a declaration in which he claims that "Mr. Ward was informed of violations by me and did nothing to correct them." Ex. A, p. 1, Plaintiff's Response to DOC Defendants' Motion. He also claims Defendant Ward had "indirect" participation through "his promulgation of unconstitutional rule, regulations, and procedures...." Id.

The undersigned finds that Plaintiff's declaration is not enough to raise a fact question regarding Defendant Ward's personal participation. Personal participation is

an essential element of a § 1983 claim.  Bennett v. Passic, 545 F.2d 1260, 1262-63 (10th Cir. 1976); see also Garrett v. Stratman, 254 F.3d 946, 950 n.4 (10th Cir. 2001) (noting that medical official must have "played a role in the challenged conduct" to be liable for an Eighth Amendment violation).  As a result, government officials have no vicarious liability in a section § 1983 suit for the misconduct of their subordinates because "there is no concept of strict supervisor liability under section 1983."  Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted).  Instead, a supervisor is liable only if he is "personally involved in the constitutional violation and a sufficient causal connection . . . exist[s] between the supervisor and the constitutional violation."  Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) (quotation omitted).  To establish a § 1983 claim against a supervisor, the plaintiff must show that an "affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988) (quotations and alterations omitted); accord Serna, 455 F.3d at 1151 ("[A] plaintiff must show an 'affirmative link' between the supervisor and the [constitutional] violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." (quotation omitted)).

Plaintiff's declaration is no less conclusory than his Second Amended Complaint, and provides no indication what violations he allegedly informed Defendant Ward about, when he did so, or any other detail for that matter.  His claim that Defendant Ward "indirectly" participated through the promulgation of policy is similarly conclusory and insufficient under the applicable legal standard.  Plaintiff makes no effort to identify the

policies or procedures which he claims Defendant Ward promulgated. "Past input into the formulation of prison regulations . . . is a connection far too attenuated to support liability under § 1983." Grimsley v. MacKay, 93 F.3d 676, 680 (10th Cir. 1996). "Otherwise liability conceivably could be imposed upon any administrator who had ever contributed . . . no matter how far removed he is from the prison or the incident in question. At some point, one's involvement simply becomes too tenuous to support liability." Id. Without more, Plaintiff's claims against Defendant Ward are in essence respondeat superior claims that are insufficient to establish liability.

The undersigned also agrees with Defendant Morton. Plaintiff's claims against Defendant Morton concern her role as the Director's Designee in the handling of administrative appeals at ODOC. Although Plaintiff attempts to characterize her actions as "biased" or "ex parte" – apparently in an attempt to remove them from the general rule that the handling of grievances cannot constitute personal participation in the alleged constitutional violations to which they pertain – he fails to point to any constitutional right that would be violated even if his characterizations are accurate. See Larson v. Meek, No. 04-1169, 240 Fed.Appx. 777, 780 (10th Cir. June 14, 2007) (finding that denial of grievances is insufficient to establish personal participation in the alleged constitutional violations); see Rauh v. Ward, No. 04-6089, 112 Fed.Appx. 692, 694 (10th Cir. Oct. 14, 2004) (regulations providing for administrative remedy do not in and of themselves create a liberty interest in that procedure, and when claim underlying administrative grievance involves constitutional right, prisoner's right to petition government for redress is right of access to the courts, which is not compromised by prison's refusal to entertain

grievance).   Defendants Franzese, Mullins, and Harvanek also move for summary judgment on grounds that the special report shows that their only involvement was in responding to grievances and requests to staff, and that those responses did not violate Plaintiff's rights.   DOC Defendants' Motion, p. 13.   To the extent Plaintiff's complaint can be construed to bring a claim against Defendants Franzese, Mullins, and Harvanek based solely upon their handling of his administrative remedies, they are also entitled to summary judgment.[6]

Defendants Kirby and Anderson are also entitled to summary judgment for their lack of personal participation in any of the acts forming the basis of Plaintiff's claims.   The supplemental special report prepared by ODOC shows that Defendants Kirby and Anderson have no authority to direct the daily operations of the Oklahoma State Penitentiary, but instead are charged with providing legal advice and with reviewing proposed operations memoranda to determine their legal sufficiency.   Att. 14, [ODOC's] Supplemental Report of Review of Factual Basis of Claims Asserted.   In his declaration, Plaintiff claims that Defendants Kirby and Anderson gave Defendants Ward, Guilfoyle, Morton, Calbone, and Dishman advice and encouragement on how to violate his rights; wrote unconstitutional regulations on religion, welfare, canteen, volunteers, diets, and grievances; and conspired on how to deny him exhaustion of administrative grievances. Ex. A, ¶ 5, Plaintiff's Response to DOC Defendants' Motion.   However, he provides no information as to how he has any personal knowledge of these conclusions.   "Rule 56 demands something more specific than the bald assertion of the general truth of a

---

[6]Plaintiff's substantive claims against these Defendants are addressed below in connection with the DOC Defendants' other grounds in support of their motion for summary judgment.

40

particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." Hanson v. Beloit Newspapers, Inc., No. 94- 4023-SAC, 1995 WL 646808, *3 (D. Kan. Sept. 15, 1995) (quoting Hadley v. County of Du Page, 715 F.2d 1238, 1243 ( 7th Cir. 1983)). Defendants Kirby and Anderson are thus entitled to summary judgment in their favor.

The DOC Defendants also move for summary judgment on the five counts which arose during Plaintiff's incarceration at GPCF, and upon which he has exhausted his administrative remedies. DOC Defendants' Motion, p. 13. The undersigned agrees that Plaintiff has failed to show any personal participation on the part of any of the DOC Defendants in the acts which form the basis of Counts I, II, III, IV, and V. Plaintiff's only response is that "DOC Defendants were directly, indirectly, and by failure to correct violation when they were informed about violations involved in violations. They were accessories, accomplices, aiders, and abetter of GPCF through unwritten strategies of interference. The lone GPCF issue DOC may not be liable for is the special pay claim." Plaintiff's Response, Ex. A, ¶ 9. However, as with his allegations against Defendants Kirby and Anderson, Plaintiff neither provides specific or concrete facts to support his claim, nor shows that he has any personal knowledge of facts that would support these sweeping conclusions. Accordingly, DOC Defendants are entitled to summary judgment as to Counts I-V.

### C. Religious Land Use and Institutionalized Persons Act (RLUIPA)

Turning to the four exhausted counts based upon events which occurred during Plaintiff's incarceration at OSP, DOC Defendants next move for summary judgment on

Plaintiff's claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc.

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [United States Supreme Court] precedents." Cutter v. Wilkinson, 544 U.S. 709, 714 (2005). "[T]he inquiry under RLUIPA is more rigorous than under the First Amendment." Lovelace v. Lee, 472 F.3d 174, 188 n. 3 (4th Cir. 2006). Section 3 of RLUIPA[7] provides that government action that "substantially burden[s]" religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000cc (a)(1), 2000cc1(a).  Section 3 applies only if the substantial burden "is imposed in a program or activity that receives Federal financial assistance" or the "substantial burden affects, or the removal of the substantial burden would affect" interstate or foreign commerce.[8] 42 U.S.C. § 2000cc-1(b).

---

[7]Section 3 of RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA, the term "government" includes "any ... person acting under color of state law." 42 U.S.C. § 2000cc-5.

[8]Plaintiff has not alleged that Defendants' religious programs receive federal financial assistance. However, the Supreme Court in Cutter appears to have opined that the federal financial assistance requirement is met with respect to inmates housed in state prison systems. Cutter, 544 U.S. at 716 n. 4 ("Every State ... accepts federal funding for its prisons."). Because Defendants do not dispute the application of Section 3, the undersigned assumes, for purposes of summary judgment only, that this requirement is satisfied.

42

Under RLUIPA, Plaintiff bears the burden of showing that the activity at issue is a religious exercise, and that Defendants have substantially burdened that exercise. 42 U.S.C. § 2000cc-1. The burden then shifts to the government to show the action is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-2(b). By its terms, RLUIPA is to be construed broadly to favor protection of religious exercise. 42 U.S.C. § 2000cc-3(g).

### 1. Diet at OSP

In Count X, Plaintiff alleges that when he was transferred to the OSP on January 27, 2005, he requested and was denied "a diet that was consistent with my sincerely held religious beliefs." Second Amended Complaint, p. [18]. He further alleges that he was told "there was no such diet" and that he should contact Defendant Chaplain Franzese. Id. Plaintiff filed a request to staff with Defendant Franzese asking for a Halal diet, and Defendant Franzese responded that under ODOC policy there are two religious diets: non-pork and vegetarian. Special Report II, Att. 5, p. 3. The DOC Defendants contend that the two alternative diets offered to Plaintiff – vegetarian and non-pork – have been found to uphold a Muslim prisoner's right to freely practice his religion. DOC Defendants' Motion, p. 16. Defendants also contend that the alternative diets offered to Plaintiff further a compelling interest through the least restrictive means, and that the balancing of the prison's compelling interests with the minimal burden on Muslim prisoners' religious rights render the provision of such diets permissible under RLUIPA.

### a.  Halal diet as religious exercise

"Religious exercise" under RLUIPA includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Thus, while Plaintiff must make a prima facie showing that his diet is an activity deserving of characterization as religious exercise, he need not show that it is mandated by his religion. See Kikumura v. Hurley, 242 F.3d 950, 960-961 (10th Cir.2001) (stating that pursuant to the definition of "religious exercise" in 42 U.S.C. § 2000cc-5(7)(A) "a religious exercise need not be mandatory for it to be protected under RFRA"); see also Adkins v. Kaspar, 393 F.3d 559, 570 (5th Cir.2004) (addressing RLUIPA claim and stating: "the Supreme Court's express disapproval of any test that would require a court to divine the centrality of a religious belief does not relieve a complaining adherent of the burden of demonstrating the honesty and accuracy of his contention that the religious practice at issue is important to the free exercise of his religion.") (footnote omitted). The relevant inquiry is not what others regard as an important religious practice but what the plaintiff believes. See Cutter, 544 U.S. at 725 n. 13 (noting that under RLUIPA, the truth of a belief is not questioned, the question is whether the belief is truly held). As one court has framed it, under RLUIPA "it matters not whether the inmate's religious belief is shared by ten or tens of millions. All that matters is whether the inmate is sincere in his or her own views." Williams v. Bitner, 359 F.Supp.2d 370, 376 (M.D. Pa.2005), aff'd in part remanded in part, 455 F.3d 186 (3rd Cir. 2006).  Although the inquiry as to what constitutes "religious exercise" could potentially be quite difficult in religions lacking well-defined, centralized or unified creedal systems, the broad definition set forth in RLUIPA makes such inquiry largely unnecessary. Grace United Methodist Church v. City of Cheyenne,

451 F.3d 643, 663 (10th Cir.2006) (RLUIPA "substantially modified and relaxed the definition of 'religious exercise'"). Under RLUIPA's broad definition and construing the evidence in the light most favorable to Plaintiff for purposes of summary judgment, Plaintiff has established a prima facie case that his Halal diet qualifies as religious exercise.

### b. Denial of Halal diet as substantial burden

The term "substantial burden" is not defined in the statute and to the undersigned's knowledge, the Tenth Circuit Court of Appeals has not yet defined the term in the context of a RLUIPA claim.[9] However, RLUIPA's legislative history provides some guidance: "The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise." 146 Cong. Rec. S7774-01, 2000 WL 1079346 (July 27, 2000).

In a recent decision, the Fourth Circuit Court of Appeals canvassed circuit decisions articulating definitions of "substantial burden" and deemed the definitions to

---

[9]In the context of a RFRA case, the Tenth Circuit Court of Appeals held that to be "substantial" a burden on religious exercise "must meaningfully curtail a prisoner's ability to express adherence to his or her faith" or must "deny a prisoner reasonable opportunities to engage in those activities that are fundamental to a prisoner's religion." Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir.1995), effectively overruled by City of Boerne v. Flores , 521 U.S. 507 (1997) (declaring RFRA unconstitutional). In a subsequent decision, Thiry v. Carlson, 78 F.3d 1491, 1495 (10th Cir.1996), the Tenth Circuit held RFRA's "substantial burden" requirement should be interpreted based on the definition set forth in Lyng v. Northwest Indian Cemetery Protective Ass'n., 485 U.S. 439 (1988). In Lyng, the Supreme Court stated that the incidental effects of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. Id. at 450-451. In a recent RLUIPA case, the Tenth Circuit recognized the tension between the definitions of "substantial burden" articulated in Werner and Lyng but did not articulate the standard for RLUIPA's substantial burden requirement. Grace United Methodist Church, 451 F.3d at 661- 662. Significantly, however, the Tenth Circuit recognized that for purposes of RLUIPA, the substantial burden requirement must not make reference to "fundamental" religious activities as RLUIPA "substantially modified and relaxed the definition of 'religious exercise.'"451 F.3d at 663.

be "generally consistent." Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006) (listing decisions). The Fourth Circuit then adopted the Supreme Court's definition of substantial burden as addressed in the related context of the Free Exercise Clause; a substantial burden is one that " 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Id. at 187 (quoting Thomas v. Review Board of Ind. Empl. Sec. Div., 450 U.S. 707, 718 (1981)). This definition is consistent with the Supreme Court's definition of substantial burden in Lyng, as adopted by the Tenth Circuit in Thiry. See also Hammons v. Jones, No. 00-CV-0143-CVE-SAJ, 2006 WL 353448 at *3 (N.D. Okla. Feb. 14, 2006) (substantial burden on religious exercise occurs when individual is forced to significantly modify his religious behavior and violate his religious beliefs; restrictions or regulations that impose mere inconveniences or have an incidental effect insufficient).

Plaintiff has not shown that a vegetarian or non-pork diet would cause him to significantly modify or violate his religious beliefs, but instead claims that he is "not a vegetarian" and that the non-pork diet actually does contain pork: "pork is put in ground beef, dairy products, animal feed, and steroids given animal." Plaintiff's response to DOC Defendants' Motion, p. 18. However, Plaintiff has failed to provide any evidentiary support for his claim that the non-pork diet contains pork. During the administrative process, Plaintiff did not contend that the non-pork diet contains pork, but instead claimed that the non-pork diet is not consistent with Islamic dietary laws, which requires a diet in which meats are grain fed, steroid free, and in which questionable items are forbidden. He also claimed that the vegetarian diet is sinful because Muslims are to eat lawful meats. DOC Special Report, Part II, Att. 2 p. [12], Att. 5 p. [12-13]. Plaintiff has

failed to come forward with any evidence that the diets offered at OSP force him to significantly modify or violate his religious beliefs, either for the reasons presented now or for the reasons presented in his administrative materials. In addition, a number of courts have held that failure to provide a Halal diet did not force Muslim inmates to significantly modify or violate religious beliefs. Malik v. Sabree, No. 8:06-319-RBH, 2007 WL 781640 at *5 (D.S.C. Mar. 13, 2007) (Muslim may practice faith without Halal products); Pratt v. Corrections Corp. of America, No. 03-3259, 2006 WL 2375656 at *9 (D. Minn. Aug. 16, 2006) (serving vegan or vegetarian meal not a substantial burden on Muslim's religion); Kahey v. Jones, 836 F.2d 948 (5th Cir.1988) (prison not required to alter existing pork-free diet to accommodate particular requests of Muslim inmate); Hudson v. Maloney, 326 F.Supp.2d 206, 211-12 (D. Mass. 2004) (concluding from its own review of the decisions of the various courts addressing the issue, that "the vast majority of these courts ha[ve] determined that a prison permissibly discharge[s] its constitutional duty to respect the dietary beliefs of Muslim inmates by offering an alternative, pork-free diet, and more broadly, that the law permit[s] prison authorities to limit the dietary options available to prisoners in the interests of reducing the costs and burdens entailed in accommodating the smorgasbord of food-related religious beliefs likely to be encountered in a prison population."); Denson v. Marshall, 59 F.Supp.2d 156, 158-159 (D. Mass. 1999) (no constitutional violation where a Muslim inmate in a disciplinary unit was denied a request for special food items to be delivered before sunrise during three to five fast days each month), aff'd, No. 99-2027, 2000 WL 1450999 (1st Cir. Sept 29, 2000); Muhammad v. Warithu-Deen Umar, 98 F.Supp.2d 337, 344-345 (W.D.N.Y. 2000) (no

constitutional violation where a Muslim inmate was denied Kosher meals because an available "Religious Alternative Menu" (RAM) did not offend any Muslim dietary requirement); <u>Abdullah v. Fard</u>, 974 F.Supp. 1112, 1118-1119 (N.D. Ohio 1997) (no constitutional violation where a Muslim inmate was provided a "nutritionally adequate alternative" for a meat entree in lieu of Halal meat), <u>aff'd</u>, No. 97-3935, 1999 WL 98529 (6th Cir. Jan. 28, 1999); <u>Benjamin v. Coughlin</u>, 708 F.Supp. 570, 575-576 (S.D.N.Y. 1989) (no constitutional violation where a prison refused to provide a Rastafarian diet, even though Jewish and Muslim prisoners were provided special diets) <u>aff'd</u> 905 F.2d 571 (2nd Cir. 1990); <u>Masjid Muhammad-D.C.C. v. Keve</u>, 479 F.Supp. 1311, 1318 (D. Del. 1979); <u>Abdul-Malik v. Goord</u>, No. 96 CIV. 1021(DLC), 1997 WL 83402, at *7-8 (S.D.N.Y. Feb. 27, 1997) (after a bench trial, district court found that Muslim inmates' rights were not violated by the prison's failure to provide Halal meat three times a week where a religious alternative meal was available).   Accordingly, DOC Defendants are entitled to summary judgment on Plaintiff's RLUIPA diet claim in Count X.

### 2.  State Funds on Religion/Religious Materials/Paid Imam

The remaining three claims all pertain to Plaintiff's complaints regarding the State's failure to spend State funds on inmate religious needs.  In Count XI, Plaintiff complains that the State spends money on secular needs but not religious needs of the inmate population.  Second Amended Complaint, p. [18].  In Count XII, he complains about the State's failure to provide a "paid civil service DOC Muslim Spiritual Leader." <u>Id.</u>  In Count XIII, Plaintiff complains that his hardback religious books were taken from him when he

arrived at OSP, and that OSP failed to replace the books using State funds.  Second Amended Complaint, p. [19].

DOC Defendants contend that RLUIPA does not require the State to purchase religious items and materials, and the fact that hardback materials were kept from Plaintiff during his thirty-five day stay[10] at OSP did not substantially burden his religious exercise. DOC Defendants' Motion, p. 18-19.  They contend that the spending of State funds on religious items would constitute an improper advancement of religion under the Establishment Clause.  Id. at 18.

Plaintiff responds that he does not contest OSP's policy of taking hard back books. Plaintiff's Response to DOC Defendants' Motion, p. 17.  He states that he is instead contesting the fact that "if you do not have money or if no private gifts and donations are forthcoming from free-world citizens, then Plaintiff and others must do without what they need to express and practice freedom of religion."  Id.  However, as the DOC Defendants contend, the failure to subsidize Plaintiff's purchase of religious materials is not a substantial burden on his right to religious exercise that violates RLUIPA.  Kaufman v. Schneiter, 474 F.Supp.2d 1014, 1026 (W.D. Wis. 2007) (prison required only to refrain from interfering with inmates' ability to locate, purchase and obtain religious materials on their own, at least insofar as obtaining such items is not inconsistent with legitimate prison interests).  According to ODOC policy, the State of Oklahoma is restricted by the State Constitution from providing religious objects/symbols with state funds,  OP-030112

---

[10]Plaintiff was transferred to OSP so that he could attend the trial of another religious discrimination lawsuit filed in the United States District Court for the Eastern District of Oklahoma, Case No. CIV-98-296-S. See Special Report I, Att. 13.

(VIII)(A)(1)(Att. 4 to Special Report, Part II), however, inmates may purchase items themselves, and items may be donated. Id. at (E)(1) and (2). Moreover, Plaintiff was only at OSP for a short period of time, further weakening any claim that ODOC's policy substantially burdened the exercise of his religion. See Dunlap v. Losey, No. 01-2586, 2002 WL 1001027 (6th Cir. May 15, 2002) ("We conclude that the temporary deprivation of his hardcover Bibles, which Dunlap might have remedied more quickly, while making the practice of his religion somewhat more difficult, did not coerce him into action contrary to his beliefs, and did not state a claim under the RLUIPA").[11]

As with the religious materials, DOC Defendants contend that ODOC does not pay religious leaders with State funds, and that RLUIPA does not require such. DOC Defendants' Motion, p. 19. DOC Defendants contend that both Defendants Franzese and Mullins informed Plaintiff of ODOC's policy, and encouraged Plaintiff to attempt to locate a volunteer Muslim spiritual leader. They have provided evidence showing that no specific religious leader is provided for any inmate's faith group, and that chaplains are required by the Oklahoma Personnel Act to be qualified and to compete for employment, and that chaplains are considered for employment without regard to their religious affiliation. Att. 9, ODOC'S Supplemental Special Report.

---

[11]The undersigned notes that Plaintiff has cited to an Oklahoma statute requiring ODOC to provide every inmate with a Bible. See Second Amended Complaint, p. [18] (citing Okla. Stat. tit. 57, § 5). Okla. Stat. tit. 57, § 5 does provide that "The keeper of each prison shall provide, at the expense of the county or state, as the case may be, for each prisoner under his charge, who may be able and desirous to read, a copy of the Bible, or New Testament, to be used by such prisoner during his confinement." However, it does not appear that this statute is applied by ODOC, and that ODOC in fact interprets the Oklahoma Constitution to be inconsistent with this statute. Moreover, Plaintiff does not contend that any of the Bibles at OSP were purchased with State funds. Indeed, his contention is that religious materials *should* be purchased with State funds and are not.

Plaintiff responds that an all-volunteer religious program favors Protestant Christianity. Plaintiff's Response to DOC Defendants' Motion, p. 21. He claims that the "policy and practice of OSP's training, recruiting, commissioning, and retaining its army of Protestant Christian volunteers creates an excessive entanglement of government with religion. Id.

Despite Plaintiff's claims, he has not demonstrated how ODOC's policy of requiring volunteer spiritual advisors and leaders has the effect of substantially burdening his religious exercise. Plaintiff has not even shown that he made any effort to comply with the policy. DOC Defendants did not interfere with Plaintiff's efforts to locate a spiritual leader from his faith community, deny him visits from a volunteer, or impose similar burdens. There is nothing in RLUIPA requiring ODOC to pay for religious leaders from the faiths represented by each of its inmates, and in particular, Plaintiff has failed to demonstrate that ODOC's failure to provide a paid Imam during his brief stay at OSP substantially burdened his religious exercise. Jonas v. Schriro, No. CV 04-2719-PHX-SMM (MEA), 2006 WL 2772641 at *4 (D. Ariz. Sept. 25, 2006) ("Plaintiff has not demonstrated that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for co-ordinating his visits with a spiritual adviser").

In summary, Plaintiff has failed to meet his initial burden of showing that any of the DOC Defendants have substantially burdened his religious exercise through the application of ODOC's policy of not spending State funds on inmate religious items or employing a non-denominational chaplain to help coordinate volunteer inmate religious

programs.  Accordingly, the undersigned finds that the DOC Defendants are entitled to summary judgment on Plaintiff's RLUIPA claims in Counts XI, XII, and XIII.

### D.  FREE EXERCISE CLAUSE OF THE FIRST AMENDMENT

Next, the DOC Defendants move for summary judgment on Plaintiff's claims under the Free Exercise Clause of the First Amendment.  They note that Plaintiff only specifically mentions the First Amendment in Count XI of the Second Amended Complaint, but contend that any claims based upon that theory are equally without merit.

In <u>Turner v. Safley</u>, 482 U.S. 78, 93 (1987), the United States Supreme Court recognized that imprisonment does not automatically deprive a prisoner of First Amendment rights. Nonetheless, greater restriction of those rights is constitutionally permissible in the prison context than elsewhere.  And, courts owe "substantial deference to the professional judgment of prison administrators." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 132 (2003).  Thus, where "difficult and sensitive matters of institutional administration" are at issue, "even where claims are made under the First Amendment" courts must not substitute their judgment for that of prison officials. <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 353 (1987).  In light of these considerations, "restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives." <u>Beard v. Banks</u>, 126 S.Ct. 2572, 2578 (2006) (internal quotations and citations omitted).

In determining the reasonableness of the policies and practices at issue, four factors govern the analysis:  First, whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

second, whether there are alternative means of exercising the right that remain open to the prison inmate; third, what impact will accommodation of the asserted constitutional right have on guards and other inmates and on the allocation of prison resources generally; and, finally, whether  ready alternatives available for furthering the governmental interest are available.  Beard, 126 S.Ct. at 2578 (internal quotations and citations omitted).  These factors were first identified by the Supreme Court in Turner, and, therefore, are commonly referred to as the Turner factors.  See also O'Lone, 482 U.S. at 350-353. Where, as here, the Court reviews the Turner factors in the context of a motion for summary judgment, the Court must determine whether Defendants, as movants, have demonstrated the absence of a genuine issue of material fact and entitlement to judgment in their favor as a matter of law.  Beard, 126 S.Ct. at 2578 (citing Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).  The prisoner then bears the burden of persuasion to set forth specific facts demonstrating a genuine issue of material fact for trial.  Id. While all "justifiable inferences" must be drawn in favor of the prisoner, the court must "distinguish between evidence of disputed facts and disputed matters of professional judgment."  Id.  As to the latter, the court's inferences "must accord deference to the views of prison authorities."  Id.

Before addressing the Turner factors, the Court must first determine, as a threshold matter, whether Plaintiff's beliefs are "sincerely held" and "religious in nature."  Searles v. Dechant, 393 F.3d 1126, 1131 (10th Cir. 2004).  DOC Defendants do not appear to contest either the sincerity or the religious nature of Plaintiff's beliefs, and so the undersigned finds that this threshold standard has been satisfied.

53

**1. First <u>Turner</u> Factor - Reasonable Relation to Legitimate Penological Interest**

To satisfy the first <u>Turner</u> factor, prison officials are "required to make a minimal showing that a rational relationship exists between [their] policy and stated goals." <u>Beerheide v. Suthers</u>, 286 F.3d 1179, 1186 (10th Cir. 2002).[12]  According to <u>Turner</u>, 482 U.S. at 89-90, a regulation will be sustained unless, "the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." Here DOC Defendants have made this showing.  First, with regard to Plaintiff's diet, DOC Defendants contend that both the common fare non-pork diet and the vegetarian diet comply with Muslim dietary laws, and that offering these menus for Muslim inmates rather than the Halal menu Plaintiff describes is rationally related to its interest in a simplified, economical food service.   <u>Abdulhaseeb v. Beasley</u>, CIV-03-1404-W, slip op. at 27-28 (W.D. Okla. Oct. 31, 2005) (M.J. Roberts) <u>adopted</u> slip op. at 3-4 (W.D. Okla. Jan. 17, 2006) (J. West), <u>appeal pending</u>, Case No. 07-6270 (10th Cir. Nov. 16, 2007).[13]  Plaintiff has failed to come forward with any contrary evidence that would raise a genuine issue of material fact as to this element.   The same is true with regard to Plaintiff's claim that OSP should spend State funds on inmate religious needs, should have hired a paid Imam, and should have purchased soft covered books for Plaintiff's use while at OSP.  The DOC Defendants have shown that the prohibition on inmates' possession of hardcover books is rationally related to security concerns, Supp. Special Report I, Att. 6-7, and that it is

---

[12]The Tenth Circuit has described the first <u>Turner</u> factor to be more of an "element" than a "factor" in the sense that it "is not simply a consideration to be weighed but rather an essential requirement." <u>Boles v. Neet</u>, 486 F.3d 1177, 1181 (10th Cir. 2007) (citing <u>Salahuddin v. Goord</u>, 467 F.3d 263, 274 (2d Cir. 2006)).

[13]DOC Defendants have also moved for dismissal of the diet claims in this case as duplicative of those in <u>Beasley</u>.  However, the undersigned has chosen to address the claim on its merits.

also rational that the expenditure of State funds to fund religious needs, pay an Imam, or to purchase paperback religious books would be in violation of the Oklahoma Constitution and serve to entangle the State in, or establish, religion.  DOC Defendants' Motion, p. 20-21; Okla. Const. Art. 2, § 5; Special Report II, Att. 18, p. [9].

### 2.  Second <u>Turner</u> Factor - Alternative Means of Exercise

Next, DOC Defendants contend that Plaintiff had an alternative means of religious expression, making the ODOC regulations in question, reasonable.  DOC Defendants' Motion, p. 22.  They claim that Plaintiff can still take advantage of the non-pork or vegetarian diet, is entitled to visits from volunteer Islamic leaders - the use of which is encouraged and accommodated, and may possess paperback religious books including the Qur'an and other religious literature.  DOC Defendants' Motion, p. 22.  They also point out that Muslim prisoners at OSP may observe Ramadan, have special Halal foods for Eid celebrations, and participate in daily and weekly Jumu'ah prayer.  <u>Id.</u>  The DOC Defendants contend that as long as Plaintiff has not been denied all means of religious expression, the ODOC policies in question are reasonable.  <u>Id.</u>  Plaintiff does not respond to DOC Defendants' claim that he has alternative means of religious expression.

In this case, the restrictions imposed by OP-030112, prohibiting the use of State funds for the purchase of religious items or the payment of religious leaders of a specific faith merely curtail certain ways of Plaintiff exercising his beliefs.  He can still acquire his paperback religious books through a volunteer, and will be allowed visits with a volunteer spiritual leader if he is able to locate one.  The same is true of the Plaintiff's request for a Halal diet; although a Halal diet is certainly one way to observe his religious beliefs, DOC

Defendants have also shown that a pork-free and vegetarian diet are available to Plaintiff. Plaintiff has simply failed to demonstrate that he had no alternative ways of expressing his religious beliefs.

### 3.  Third <u>Turner</u> Factor - Impact on Guards and Other Inmates

Third, DOC Defendants claim that Plaintiff's request for an accommodation of his religious practices would have an adverse impact on guards and other inmates.  DOC Defendants' Motion, p. 23.  They claim that ODOC's use of State funds to purchase Islamic items or to employ an Imam would force staff to violate the United States and the Oklahoma Constitutions, and would be unfair to inmates of other religions.  <u>Id.</u>  They also claim that Plaintiff's dietary request would be burdensome, and that "there can be little question that the cost and the security needs of the prison, including staffing required to provide the dietary accommodations requested by Plaintiff, would create additional burdens...."  <u>Id.</u> at 23.[14]

In response, Plaintiff only repeats his claims that reliance upon volunteers has the tendency to favor Christianity.  Plaintiff's Response to DOC Defendants' Motion, p. 21. He does not address the DOC Defendants' concerns regarding violation of the Establishment Clause or the burdens that would be created by providing Plaintiff with a Halal diet.  DOC Defendants' contention that the use of State funds for Plaintiff's religious needs or those of other Muslims would have the primary effect of advancing Islam and would run afoul of the Establishment Clause of the First Amendment is persuasive. <u>See</u>

---

[14]This quoted language is taken from the earlier case filed by Plaintiff in this Court.<u>Abdulhaseeb v. Beasley</u>, CIV-03-1404-W, slip op. at 30-31 (W.D. Okla. Oct. 31, 2005) (M.J. Roberts) <u>adopted</u> (W.D. Okla. Jan. 17, 2006) (J. West), <u>appeal pending</u>, Case No. 07-6270 (10th Cir. Nov. 16, 2007).

Utah Gospel Mission v. Salt Lake City Corp., 425 F.3d 1249, 1259 (10th Cir. 2005).  The same is true of their claim regarding the special religious diet requested by Plaintiff.  With no response from Plaintiff on either of these points, this factor weighs in favor of Defendants.

### 4.  Fourth <u>Turner</u> Factor - Absence of Ready Alternatives

The final factor is whether there exist ready alternatives that would fully accommodate Plaintiff's religious exercise at a de minimis cost to penological interests. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." <u>Turner</u>, 482 U.S. at 90.  Although <u>Turner</u> does not require ODOC to demonstrate they have considered or tried all other methods of accommodating an inmate's request, it must provide evidence that the cost and security issues advanced are other than de minimis. <u>Id.</u> at 90-91.   Here, as with the other factors, Plaintiff has done nothing to rebut the DOC Defendants' evidence regarding the security concerns of allowing inmates to have hard cover books, or concerns regarding the ODOC's support of Islam through the purchase of religious materials or the establishment of a special Halal religious diet.

On balance and applying appropriate deference to the professional judgment of prison officials, evidence relating to the  Turner factors supports the conclusion that the prison regulations at issue do not violate Plaintiff's First Amendment rights.  Since the regulations pass scrutiny under the <u>Turner</u> standards, Plaintiff cannot establish that his First Amendment Free Exercise rights were violated by the actions he complains of in Counts X, XI, XII, or XIII.

**E.  ESTABLISHMENT CLAUSE**

DOC Defendants note that throughout his Second Amended Complaint, Plaintiff contends that Defendants have endorsed Christianity over Islam, and to the extent Plaintiff is making a claim under the Establishment Clause of the First Amendment, they also move for summary judgment.  DOC Defendants' Motion, p. 25.

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting the establishment of religion."  U.S. Const. amend. I.  The Supreme Court has recognized that this language "is at best opaque" and that a "law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause."  Lemon v. Kurtzman, 403 U.S. 602, 612 (1971).  Under Lemon, a government practice is constitutional if: (1) it has a secular purpose; (2) its principal or primary effect neither advances nor inhibits religion; and (3) it does not excessively entangle the government with religion.    Id. at 612-13.  Here, all of the practices complained of are constitutional under this test.  The provision of common fare non-pork and vegetarian diets for Muslim inmates, and the use of a volunteer program for religious materials and spiritual leaders have secular purposes:  in the former case, a simplified and economical food service; and in the latter, compliance with the Oklahoma and United States Constitutions.  Likewise, Plaintiff has failed to show how the failure to offer a Halal diet inhibits his religion so long as non-pork and vegetarian diets are offered; and Plaintiff, like the member of any other religious group, has a reasonable opportunity to acquire religious materials and contact religious leaders through the volunteer program, and was encouraged to do so.  Finally, use of a chaplain that is hired without regard to

religious affiliation in order to coordinate the volunteer-based religious program allows ODOC to have a religious program without becoming excessively entangled in any particular religion.  Thus, the undersigned finds that Plaintiff has failed to come forward with evidence showing that the DOC Defendants are showing favoritism to Christian inmates, or that they have developed or implemented policies that excessively entangle the State with the Christian religion in violation of the establishment clause.

DOC Defendants also move for summary judgment on Plaintiff's Establishment Clause claim on the basis of issue preclusion stemming from a previous lawsuit filed in the Eastern District of Oklahoma, Case No. CIV-98-0296.  DOC Defendants' Motion, p. 26 n. 7. They have provided the Agreed Pretrial Order and the Judgment in that case.  DOC Defendants' Motion, Exs. 2 and 3. From the Agreed Pretrial Order, it appears that two of the counts in that action alleged that the warden of the Lexington Correctional Center and the ODOC religious coordinator acted to establish Christianity as the official ODOC religion by maintaining an all-Christian chaplaincy, soliciting funds for Christian programs only, and targeting only Christian inmates for outreach and consultation; judgment was entered in favor of the defendants.  Id. The case was at that point on remand from the Tenth Circuit Court of Appeals, which had described the claim as follows:

> [Plaintiff] contended that the ODOC, warden Hargett, and Defendant Stoltz have acted to establish Christianity as the official ODOC religion.  In Count Fourteen, he alleged that [Lexington Correctional Center] officials openly advocated Christianity and that they failed to ensure that equal time, money, or resources are given to the Muslim community. ...  In Count Eighteen, [Plaintiff] asserted that Stoltz maintained an all Christian-chaplaincy, solicited and appropriated funds for Christian programs, and targeted only Christian inmates for outreach and consultation.

59

<u>Abdulhaseeb v. Saffle</u>, No. 01-7103, 65 Fed.Appx. 667, 675 (10th Cir. Mar. 27 2003). Although it does appear that a similar Establishment Clause claim was indeed raised by and decided against Plaintiff in this previous case, the claim appears to have a slightly different factual basis than the one presented here.  In the previous case, Plaintiff alleged that the warden and religious coordinator were actively favoring Christianity, whereas here, Plaintiff is alleging an Establishment Clause violation based upon the fact that the overall religious program is funded through donations and volunteers, having the effect of favoring Christianity. Because the issues are not exactly the same, and Plaintiff has in any event failed to come forward with evidence to defeat the DOC Defendants' motion for summary judgment on his Establishment Clause claim, the undersigned recommends granting the motion on its own merit rather than on the basis of defensive collateral estoppel.

### F.  EQUAL PROTECTION

DOC Defendants also move for summary judgment on Plaintiff's equal protection claim in Count XI, in which he claims that ODOC violated his right to equal protection by spending money for secular needs but not religious needs.  DOC Defendants' Motion, p.27. They claim that unless Plaintiff is a member of a suspect class or a fundamental right is a stake, disparate treatment need only be rationally related to a governmental purpose. <u>Id.</u>  They claim that Plaintiff's status as an inmate does not make him a member of a suspect class, and that he has no fundamental right to have State funds spent on religious needs.  <u>Id.</u>

Plaintiff responds that religious inmates spend money in the canteen, but that money from the canteen operations fund is only spent on secular items.  Plaintiff's Response to DOC Defendants' Motion, p. 22.  He also cites use of money from other funds, including the welfare and recreation fund, and the employee/inmate welfare fund, on only secular items.  Id.  Finally, he notes that in 2005, ODOC began spending State funds on Jewish Kosher diets.[15]

The Equal Protection Clause "requires the government to treat similarly situated people alike."  Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir. 1998) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). Thus, to assert a viable equal protection claim a plaintiff must first make a threshold showing that he was treated differently from others who were similarly-situated to him. Id. Plaintiff has not made this showing. "Unless a legislative classification either burdens a fundamental right or targets a suspect class, it need only bear a rational relation to some legitimate end to satisfy the Equal Protection Clause."  Kinnell v. Graves, 265 F.3d 1125, 1128 (10th Cir. 2001) (internal quotations omitted). Plaintiff does not allege treatment stemming from his membership in a suspect class, and he has not submitted any evidence to show that other groups of similarly-situated inmates received different or better treatment than he did. There was no improper differential treatment here because no prisoners – Muslim or otherwise – were served Halal meals. Plaintiff has not shown that his faith prohibited him

---

[15]The institution of a Kosher religious diet at ODOC resulted from litigation in this Court. Fulbright v. Evans, No. CIV-03-99-W, CIV-03-125,CIV-03-1465 (W.D. Okla. Feb. 8, 2006) (J. West) (granting permanent prospective injunction that Director of ODOC provide Kosher meals at no cost to three Orthodox Jewish inmates). It was noted in the course of that litigation that there were 52 Orthodox Jewish inmates in the custody of the Department of Corrections. Id. at Third Supplemental Report and Recommendation, p. 7 ¶ 7 (Sept. 8, 2005) (M.J. Purcell).

from eating non-pork or vegetarian common fare meals, or that the DOC Defendants refused to accommodate his religious dietary needs while simultaneously accommodating the dietary requirements of other similarly situated inmates.  Although Plaintiff claims that ODOC has been spending State funds on Jewish Kosher diets since 2005, he does not provide any evidentiary support showing that he is similarly situated to any inmate receiving a Kosher diet or that any inmate receiving such a diet does not require one for religious reasons.  Accordingly, it is recommended that any claim based upon a theory of equal protection be denied.

## G.  PROCEDURAL DUE PROCESS

Next, DOC Defendants claim that although it is unclear to them whether Plaintiff is making a Fourteenth Amendment claim for the hard cover books that were taken from him upon his arrival at OSP and apparently not returned, he has no right to due process for the deprivation of property that is contraband under prison rules. DOC Defendants' Motion, p. 28-29.

Plaintiff does not respond directly to the DOC Defendants' due process contention, but simply states that he "asserts a RLUIPA Proposition" in the count in which he complains about the confiscation of his hardback books.  Plaintiff's Response to DOC Defendants' Motion, p. 23.  Accordingly, it is recommended that summary judgment be granted on any due process claim based upon the taking/or failure to return Plaintiff's hard cover books.

## H.  QUALIFIED, QUASI-LEGISLATIVE, AND ELEVENTH AMENDMENT IMMUNITY

Next, DOC Defendants move for summary judgment on grounds of qualified, quasi-legislative, and Eleventh Amendment immunity.  DOC Defendants' Motion, p. 29, 32, 33. In his Second Amended Complaint, Plaintiff seeks "[i]njunctive relief, actual damages, compensatory damages, and punitive damages, and compensation for costs of litigating civil suit."  Second Amended Complaint, p. [15].  Plaintiff does not state in what capacity he sues the various Defendants.

In a 42 U.S.C. § 1983 action against a state official in the official's individual capacity, the defendant is entitled to qualified immunity unless the official's conduct violated a clearly established constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  Thus, the evaluation of a claim of qualified immunity requires the reviewing court to determine whether the defendant's actions, as alleged in the complaint, violated a constitutional or statutory right, and, if so, whether the right allegedly violated is clearly established.  Denver Justice and Peace Committee, Inc. v. City of Golden, 405 F.3d 923, 928 (10th Cir. 2005).  Because the DOC Defendants are otherwise entitled to summary judgment, it is unnecessary to address the qualified immunity issue.  "[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).

Similarly, because it is recommended that Defendants Ward, Kirby and Anderson be granted summary judgment on grounds that Plaintiff has failed to come forward with evidence showing their personal participation in the acts forming the basis of his claims,

it is unnecessary to address the issue of whether they are entitled to absolute, quasi-legislative or policy-making immunity.

The Eleventh Amendment bars suit in federal court against a state. <u>Board of Trustees of University of Alabama v. Garrett</u>, 531 U.S. 356, 363 (2001). When a state official is named as a defendant, the Eleventh Amendment continues to bar the action "if the state is the real, substantial party in interest." <u>Frazier v. Simmons</u>, 254 F.3d 1247, 1253 (10th Cir. 2001). An exception exists when Eleventh Amendment immunity has been waived by the state or abrogated by Congress. <u>Chaffin v. Kansas State Fair Board</u>, 348 F.3d 850, 866 (10th Cir. 2003). The State of Oklahoma has not waived its Eleventh Amendment immunity, Okla. Stat. tit. 51 § 152. 1(B) (2001) ("it is not the intent of the state to waive any rights under the Eleventh Amendment to the United States Constitution"), and Congress did not abrogate the states' Eleventh Amendment immunity through the enactment of Section 1983. <u>Quern v. Jordan</u>, 440 U.S. 332, 345 (1979). Thus, the Eleventh Amendment forecloses assertion of an official-capacity claim under § 1983 against the DOC Defendants for monetary relief. <u>Pennhurst State School & Hospital v. Halderman</u>, 465 U.S. 89, 120 (1984). The Court should dismiss these claims without prejudice to refiling.[16]

---

[16]Eleventh Amendment immunity forecloses suit in federal court, but does not bar litigation in state court. <u>Maine v. Thiboutot</u>, 448 U.S. 1, 9 n.7 (1980). Thus, dismissal on grounds of the Eleventh Amendment should ordinarily be without prejudice to assertion of the claim in state court. <u>Divine Church of God and Christ v. Taxation & Revenue Department</u>, No. 97-2068, 1997 WL 355326, at *2 (10th Cir. June 27, 1997). However, because the DOC Defendants are otherwise entitled to summary judgment on the merits of Plaintiff's exhausted claims they would be entitled to raise any applicable defenses, such as defensive collateral estoppel or issue preclusion, flowing from that determination in any subsequent official capacity action brought in State court.

Notably, a split in circuit authority has developed as to whether RLUIPA waives a state's Eleventh Amendment immunity.  <u>Compare</u> <u>Lovelace v. Lee</u>, 472 F.3d 174, 192 (4th Cir. 2006) ("[O]ur court holds that a state's Eleventh Amendment immunity from suit for damages is not waived in RLUIPA.") <u>with</u> <u>Benning v. Georgia</u>, 391 F.3d 1299, 1305 (11th Cir. 2004) ("Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA.") <u>rehearing en banc denied</u>, 129 Fed. Appx. 603 (11th Cir. 2005).  The Tenth Circuit Court of Appeals has not yet decided the issue.  Because Defendants cite only case law addressing sovereign immunity in the context of claims brought pursuant to § 1983, the undersigned declines to address the issue in the context of RLUIPA.

In conclusion, it is recommended that the DOC Defendants, Cornell Defendants, and Canteen Defendants be granted summary judgment on Counts VI, VII, VIII, IX, XIV, XV, XVI, and XVII for Plaintiff's failure to exhaust his administrative remedies and that those Counts be dismissed without prejudice.  It is further recommended that the DOC Defendants be granted summary judgment on the merits of Plaintiff's individual capacity claims and his official capacity claims for prospective injunctive relief as contained in Counts I-V and X-XIII.[17]  Finally, it is recommended that any official capacity claims against DOC Defendants for declaratory or retrospective injunctive relief under §1983 be dismissed without prejudice on grounds of Eleventh Amendment immunity.

---

[17]DOC Defendants also contend that Plaintiff's claims for declaratory and injunctive relief are moot because he is no longer incarcerated at either OSP or GPCF. and that he is not entitled to damages under the Prison Litigation Reform Act, 42 U.S.C. 1997e(e), because he cannot show any physical injury. DOC Defendants' Motion, p. 33-34.  Because the undersigned is recommending that the DOC Defendants be granted summary judgment on the merits of Plaintiff's claims, it is unnecessary to address these additional contentions.

### III.  MOTION OF CORNELL DEFENDANTS

####   A.  RLUIPA

There are five exhausted claims remaining against the Cornell Defendants, and they have moved for summary judgment on those claims on several grounds.  The undersigned notes that the Canteen Defendants join with the Cornell Defendants in their motion for summary judgment with regard to Counts II and V.

As noted above, under RLUIPA, Plaintiff bears the burden of showing that the activity at issue is a religious exercise, and that the Cornell Defendants have substantially burdened that exercise. 42 U.S.C. § 2000cc-1. The burden then shifts to the government to show the government action is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-2(b). By its terms, RLUIPA is to be construed broadly to favor protection of religious exercise. 42 U.S.C. § 2000cc-3(g).

####   1.  Count I – Failure to Employ a Paid Imam

Similar to his claim regarding OSP in Count XII, Plaintiff complains in Count I that GPCF does not employ a paid Imam. The Cornell Defendants move for summary judgment on grounds that GPCF does not employ Christian or any other religious leaders, and that the failure to employ an Imam does not violate RLUIPA.  Cornell Motion, p. 8.  For the same reasoning as that stated above in connection with the DOC Defendants' motion, supra pp. 48-51, the undersigned recommends that summary judgment be granted in favor of the Cornell Defendants on Count I.  Plaintiff has not shown how the failure to employ a paid Imam substantially burdened his religious exercise. See Jonas v. Schriro, No. CV

04-2719-PHX-SMM (MEA), 2006 WL 2772641 at*4 (D. Ariz. Sept. 25, 2006) ("Plaintiff has not demonstrated that his ability to practice his religion is substantially burdened by the requirement that he bear the responsibility for co-ordinating his visits with a spiritual adviser").

### 2. Count II – Forcing Plaintiff to Accept Pudding on His Food Tray

The Cornell Defendants move for summary judgment on Count II, claiming that the pudding and jello products were at a self-serve bar at the prison, and that Plaintiff has not demonstrated that the items contained pork products – only that he believed they did even though the facility asserted they were pork free.  Cornell Motion, p. 8.

In response, Plaintiff submitted a declaration in which he states that "sometimes jello and pudding were self-served on the salad bar at GPCF.  Most times jello and pudding were served by food servers."  Ex. A, ¶ 2, Plaintiff's Response to Cornell Defendants' Motion.  He continues that "Defendants Cartwright and Beasley insisted that I accept the food trays with pudding and jello on them despite my religious objection." Id.  However, Plaintiff does not respond to Defendants' claim that jello and pudding served at GPCF is free of pork products.

Under RLUIPA, it is Plaintiff who bears the burden of showing that Defendants have substantially burdened his religious exercise. 42 U.S.C. § 2000cc-1. A substantial burden on religious exercise occurs when he is forced to significantly modify his religious behavior and violate his religious beliefs – restrictions or regulations that impose mere inconveniences or have an incidental effect are insufficient.  Hammons v. Jones, No. 00-CV-0143-CVE-SAJ, 2006 WL 353448 at *3 (N.D. Okla. Feb. 14, 2006); supra, p. 45-46.

Plaintiff has simply failed to meet this burden with regard to his claim regarding the serving of pudding at the GPCF facility during his incarceration there.

### 3. Count IV – Islamic Revival

The Cornell Defendants contend that Plaintiff has failed to show that their failure to provide an Islamic revival meeting at GPCF violated his rights under RLUIPA.  Cornell Defendants' Motion, p. 9.  First, they claim that the Christian revival that was provided was not provided by GPCF, but by volunteer sponsors.  Id.  Second, they claim that Defendant Wood inquired about a similar revival for Islamic inmates, and was told by the inmates that this was not a practice of the Islamic faith.  Id. (citing Cornell Supplemental Special Report, Ex. 8).

Plaintiff responds that Defendant Wood "tried to make me 'coordinate' the requested Islamic revival."  Plaintiff's Response to Cornell Defendants' Motion, Ex. A ¶ 4.  He also claims that Muslims do "missionary" work and have a "concept" for religious revival.  Id.  He also claims that an outside group did not sponsor the Christian revival, and states that Defendant Morton "encouraged GPCF Defendants to lie" and that "they are lying under oath."  Id.

Plaintiff offers nothing to support his claims that failure to sponsor a revival meeting substantially burdened the exercise of his religion, however.  And even more troubling, he has failed to support his claim that the Cornell Defendants have committed perjury or that the Christian revival meeting was not sponsored by volunteers.  Even more telling, perhaps, is his concession that Defendant Wood did indeed encourage him to

coordinate the revival that he requested.  It is recommended that summary judgment be granted to the Cornell Defendants on Count III under RLUIPA.

### 4.  Count V – Failure of GPCF to Purchase Halal Meat and Allow Muslim Inmates to Prepare it for Eid-ul-Adha

In Count V, Plaintiff complains that the Cornell Defendants refused to purchase Halal chicken breasts from an approved vendor and allow the Muslim inmates to assist the administration, food service, and religious department to prepare and serve them to the entire inmate population to celebrate the Feast of the Sacrifice of Abraham.  Second Amended Complaint, p. [13].  The Cornell Defendants claim that failure to provide the meats for the meal did not substantially burden his religious exercise as the Halal diet  is not a central tenet of Islam and ODOC policy does not require that Halal meats be provided.  Cornell Defendants' Motion, p. 10.  Plaintiff does not provide any evidence that Halal meat is necessary to celebration of the Feast, or even that failure to celebrate the Feast itself would substantially burden his religious exercise.  Furthermore, ODOC policy allows food for festive or ceremonial meals to be purchased by the faith community or donated, and for the meals to be eaten together by the faith community.  Cornell Supplemental Special Report, Ex. 2, p. 6.  Plaintiff has failed to come forward with evidence that would defeat the Cornell Defendants' motion for summary judgment on Count V under RLUIPA.[18]

---

[18]The Cornell Defendants also move for summary judgment based upon Plaintiff's claim that failure to employ a paid Imam, hold an Islamic Revival, and provide Halal chicken breasts for the Islamic inmates to prepare for the prison population at GPCF was a violation of his rights under the Free Exercise Clause of the First Amendment.  However, in his response, Plaintiff notes that he brings these claims under RLUIPA and not the Free Exercise Clause.  Accordingly, it is unnecessary to address the Cornell Defendants' motion for summary judgment on this alternate theory.  See Plaintiff's Response to Cornell Defendants' Motion, p. 11.

## B. EQUAL PROTECTION

Finally, the Cornell Defendants move for summary judgment on Plaintiff's equal protection claim in Count III that he was denied "a second friend on [his] visiting list like similarly situated inmates at medium security facilities in GPCF/DOC who do not get visits from immediate family members."  Second Amended Complaint, p. [12].  The Cornell Defendants contend that Plaintiff has no fundamental right to be visited in prison, and that he has failed to show that "prisoners who are not visited by family members" comprise a constitutionally protected class.  Cornell Defendants' Motion, p. 19.  Thus, they contend they need only show a rational basis for the visitation policy.  Id.  They claim that restrictions on visitation are rationally related to prison security, and that Plaintiff's equal protection claim is thus groundless.

Plaintiff responds only that "many" white inmates enjoy a second visitor on their visitor lists, and that he belongs to a suspect class of black inmates not given the benefit of that policy.  Plaintiff's Response to Cornell Defendants' Motion, p. 11.  In his declaration, he also states that under ODOC policy, inmates with no immediate family can be permitted up to six friends, and that "white inmates received the gracious benefit of that policy at GPCF."  Id. at Ex. A ¶ 3.

As noted earlier, in order to succeed on his equal protection claim, Plaintiff would have to show that he was "similarly situated" to the inmates to whom he is comparing himself, Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir.1998), and that the difference in treatment was not "reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. 78, 89 (1987).  Here, Plaintiff has attempted to draw a distinction based

upon race, but has failed to identify even one inmate who has received the "gracious benefit" of ODOC's general visitation policy at GPCF.  His vague and conclusory observations that he was not treated as favorably as an unidentified group of inmates is completely insufficient to satisfy his burden under the Equal Protection Clause. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." Hanson v. Beloit Newspapers, Inc., No. 94-4023-SAC, 1995 WL 646808, *3 (D. Kan. Sept. 15, 1995) (quoting Hadley v. County of Du Page, 715 F.2d 1238, 1243 ( 7th Cir. 1983)).  The Cornell Defendants are entitled to summary judgment on this claim.[19]

In summary, the Cornell Defendants are entitled to summary judgment on Plaintiff's claims in Counts I-V, and the Canteen Defendants are also entitled to summary judgment on Counts II and V.

### RECOMMENDATION

For the reasons set forth above, it is recommended that the motion to dismiss/motion for summary judgment of Defendants Ward, Mullin, Morton, Kirby, Anderson, Franzese, Guilfoyle, and Harvenek [Doc. No. 121] be treated as a motion for summary judgment, and that the motion be granted as follows: on Counts VI, VII, VIII, IX, XIV, XV, XVI, and XVII for Plaintiff's failure to exhaust his administrative remedies and that those Counts be dismissed without prejudice;  on the merits of Plaintiff's individual capacity claims and his official capacity claims for prospective injunctive relief as

---

[19]Moreover, the Supreme Court has held that inmates have no right to unfettered visitation. Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460(1989).

contained in Counts I-V and X-XIII;  and any official capacity claims for declaratory or retrospective injunctive relief under §1983 be dismissed without prejudice on grounds of Eleventh Amendment immunity. It is further recommended that the motion for summary judgment of Defendants Calbone, VanWey, Wood, Branam, Elizondo, Beasley, Jacques, DeVaughn, Haskins, Smith, Barger, and Dishman [Doc. No. 126] be granted as follows: on Counts VI, VII, VIII, IX, XIV, XV, XVI, and XVII for Plaintiff's failure to exhaust his administrative remedies and that those Counts be dismissed without prejudice, and on the merits of Counts I, II, III, IV, and V.   It is further recommended that the motion for summary judgment of Defendants Mock and Cartwright be granted as follows: on Count IX for Plaintiff's failure to exhaust his administrative remedies, and on the merits of Counts II and V.   All remaining motions are denied as moot. The Plaintiff is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court by March 3, 2007, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. The Plaintiff is further advised that failure to make timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal questions contained herein.  Moore v. United States, 950 F.2d 656 (10th Cir. 1991).  This Report and

Recommendation disposes of the issues referred to the undersigned Magistrate Judge in the captioned matter.

ENTERED this 12th day of February, 2008.

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE